**In re IMPERIAL CORPORATION OF AMERICA, a Delaware corporation, Debtor.**

**IMPERIAL CORPORATION OF AMERICA, a Delaware corporation, Plaintiff,**

v.

**MILBERG, WEISS, BERSHAD, SPECTHRIE & LERACH, etc., et al., Defendants.**

Bankruptcy No. 90–01585–LM11.

Adv. P. 90–90369–A11.

United States Bankruptcy Court, S.D. California.

Aug. 18, 1992.

---

Patrick C. Shea, Sue J. Hodges, Lori Partrick, Pillsbury, Madison & Sutro, San Diego, Cal., for plaintiff, Imperial Corp. of America.

Ronald L. Leibow, Stroock, Stroock & Lavan, Michael H. Weiss, Weiss, Scolney & Spees, Los Angeles, Cal., for Ronald L. Durkin, trustee of The Benchmark Irrevocable Trust.

James P. Hill, Susan E.H. Ragsdale, Sullivan, Hill, Lewin & Markham, San Diego, Cal., for defendants Milberg, Weiss, Bershad, Spechthrie & Lerach; Greenfield & Chimicles; Barrack, Rodos & Bacine; Clemens, Glassman and Clemens; Berger & Montague, P.S.; Sirota & Sirota; Stull, Stull & Brody; Goodkind, Labaton & Rudoff; and Schiffrin & Craig, Ltd.

## MEMORANDUM DECISION

LOUISE DeCARL ADLER, Bankruptcy Judge.

Defendants Milberg, Weiss, *et al.*, bring a motion to dismiss or, in the alternative, for summary judgment in Imperial Corporation of America's ("ICA") complaint to avoid and recover preferential transfers pursuant to 11 U.S.C. §§ 547 and 550. At issue is whether a settlement of a securities class action and derivative suit for $13 million within 90 days of the filing of ICA's bankruptcy petition may be avoided. Of the total settlement fund, ICA contributed $503,835.61 directly from its funds; its insurer contributed the remaining $12.5 million plus interest. Having considered the

pleadings, arguments of counsel and the cases cited by the parties, the Court adheres to the tentative ruling to grant the motion in part and deny it in part.

### FACTUAL SUMMARY

The class action lawsuit,[1] was commenced in January 1989, in the United States District Court for the Southern District of California. The action sought recovery on behalf of all persons who purchased the common stock of ICA during the period of March 26, 1987 through July 7, 1989, and who sustained damages as a result of those purchases. The class action stated causes of action for violations of §§ 10(b), 14(a) and 20 of the Securities Exchange Act of 1934 and Rule 10b-5 and 14a-9, as well as for violations of California state law. The class action also asserted claims derivatively on behalf of ICA against certain of the officers and directors of ICA, as well as other parties for securities law violations, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), breach of fiduciary duty and waste of corporate assets. (Def.'s Mem. of P. & A. at 2–3.)

On December 8, 1989, the parties entered into a stipulation for settlement which was preliminarily approved by a magistrate judge on January 11, 1990. The settlement terms apportioned $10 million of damages to satisfaction of the class action claims for securities laws violations and $2.5 million to satisfaction of the derivative claims asserted by the class plaintiffs. Although the exact amount contributed by ICA appears to be in contention, American Casualty, ICA's insurer, transferred $12.5 million to a settlement fund created to pay the damages awarded.

On or about February 22, 1990, the magistrate judge entered an order awarding Milberg, Weiss *et al.,* $3.9 million in fees and expenses of $411,333.67. The firm disbursed the fees and expenses to themselves and other counsel from the Settlement Fund on February 26, 1990. ICA's Chapter 11 petition was filed February 28, 1990.

1. The class action lawsuit consisted of five actions consolidated under the case name *Imperial*

The remaining settlement funds were paid to class members sometime in July 1990. This complaint to recover the alleged preferential transfers was filed on August 1, 1990.

The complaint seeks to avoid transfers on two main theories:

1. That the $10 million paid to the class plaintiffs for securities laws violations and the $2.5 million paid them in satisfaction of the derivative claims is a voidable transfer; and,

2. That the $4,311,333.67, in attorneys' fees and costs paid to Milberg, Weiss and others is recoverable as a payment on an antecedent debt.

### ISSUES PRESENTED

I. Is any part of the proceeds of the indemnity/liability insurance coverage of ICA property of the estate?

II. Is any part of the $4,311,333.67, paid to counsel for the class plaintiffs recoverable as a payment on an antecedent debt?

### DISCUSSION

#### I.

 The directors' and officers' liability insurance policies provided direct coverage to ICA's officers and directors for liability arising out of their positions with the company:

(a) With the Directors and Officers of [ICA] that if, during the policy period, any claim or claims are made against the Directors and Officers, individually or collectively, for a Wrongful Act, the Insurer will pay in accordance with the terms of this policy, on behalf of the Directors and Officers or any of them, their heirs, legal representatives or assigns, all Loss which the Directors and Officers or any of them shall become legally obligated to pay.

The insurance policies further provided for indemnification coverage for ICA in the event it was obligated to pay losses on behalf of the directors or officers:

*Corp. of America v. Thygerson, et al.,* Civ. No. 89–0126–JLI.

(b) With [ICA] that if, during the policy period, any claim or claims are made against the Directors and Officers, individually or collectively, for a Wrongful Act, the Insurer will pay, in accordance with the terms of this policy, on behalf of [ICA] all loss for which [ICA] is required to indemnify or for which [ICA] has to the extent permitted by law, indemnified the Directors and Officers.

The policy defines the term "Wrongful Act" as:

[A]ny actual or alleged error, misstatement, misleading statement, act or omission, or neglect or breach of duty by the Directors or Officers in the discharge of their duties solely in their capacity as Directors or Officers of [ICA], individually or collectively, or any matter claimed against them solely by reason of their being Directors or Officers of [ICA]. (Park Decl. Ex. A at 4.)

There is no controlling Ninth Circuit precedent directly addressing the question of whether the proceeds of a liability insurance policy covering officers of the debtor are property of the debtor's estate. Although plaintiff has cited *In re Minoco Group of Cos., Ltd.*, 799 F.2d 517 (9th Cir.1986), in support of its position, that case does not directly apply to these facts. In *Minoco*, the question was whether the policies which the insurer was seeking to cancel were property of the debtor's estate. The policies in *Minoco* appear to have had virtually identical language to those under consideration in this case. The appeals court found that not only did the policies benefit the officers and directors, but also Minoco, "... because the policies insure Minoco against indemnity claims made by officers and directors." *Minoco* at 519. The court further found that were the policies canceled, Minoco would be required to indemnify present and former officers and directors for legal expenses arising out of their activities, thereby rendering reorganization difficult, if not impossible. *Id.* at 518. The Court of Appeals affirmed the bankruptcy court, adopting the reasoning of the Fourth Circuit in the *A.H. Robins* case that liability policies, "... meet the fundamental test of whether they are

'property of the estate' because the debtor's estate is worth more with them than without them." *Id.* at 519; *A.H. Robins Co. v. Piccinin*, 788 F.2d 994 (4th Cir.1986).

While the *Minoco* logic is compelling as applied to ownership of the policy, the question of entitlement to the proceeds is not addressed by the case. *In re Louisiana World Expo., Inc.*, 832 F.2d 1391 (5th Cir.1987). *L.W.E.* wrestled with the question of ownership of liability insurance proceeds where an official creditors' committee sought to stop the payment of proceeds of a directors' and officers' liability insurance policy to the debtor's officers and directors as reimbursement for their legal expenses. In arriving at its decision, the Court of Appeals was careful to define the issue:

The question is not who owns the policies, but who owns the liability proceeds. Although the answer to the first question quite often supplies the answer to the second, this is not always so.... At 1399.

The *L.W.E.* court went on to hold that the debtor had no ownership interest whatever in the proceeds of the liability coverage for the officers and directors. The obligation of the insurance company ran to the directors and officers and the proceeds would be payable only to them in the event they incurred covered legal expense or liability. The court distinguished its holding from the question of whether L.W.E. had a property interest in its indemnification coverage, as that was not an issue before the court.

However, in this case, the Court is not persuaded that the question of ownership of the indemnification proceeds should be resolved differently from the way in which the *L.W.E.* court determined ownership of liability proceeds. The indemnification coverage compensates ICA for losses arising out of its obligation to indemnify its officers and directors. The policy had an express exclusion:

IT IS UNDERSTOOD AND AGREED that the Insurer shall not be liable to make any payment for Loss as defined in Clause 1(d) hereof, which is based upon or attributable to any claim made against

Director or Officer by any other Director or Officer *or by the Institution.* Defined in Clause 1(a) of the Policy (hereinafter called "Institution") except for a shareholder's derivative action brought by a shareholder of the Institution other than an insured. (See Park Decl., Ex. A at 18)

In other words, the policy expressly excluded any payment to the insured ICA for damages it may have suffered by reason of its directors' or officers' wrongdoing. The exclusion makes clear that ICA's coverage was limited to indemnification for sums it was forced to pay on behalf of those officers and directors.

The Court is aware that in some instances bankruptcy courts have exercised jurisdiction over indemnification proceeds. For example, where there are so many claims against an insurance fund that it is likely it will be shortly exhausted, leaving other claimants unsatisfied and the corporate debtor exposed to unfunded claims, some courts have exercised jurisdiction over the insurance proceeds to equalize distribution. *See In re Forty–Eight Insulations, Inc.,* 54 B.R. 905, 908 (Bankr.N.D.Ill.1985); *Matter of Johns–Manville Corp.,* 26 B.R. 405, 429 (Bankr.S.D.N.Y., 1983); *A.H. Robins Co., Inc. v. Piccinin,* 788 F.2d 994, 1003–1008 (4th Cir.1986), *cert. denied* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986). There is no evidence that that is the case here. ICA's exposure to additional loss arising out of circumstances of this nature was capped by the confirmation of ICA's plan of reorganization and implementation of the discharge provisions of that plan. Unlike *Johns–Manville* and *Robins,* there is no showing that exercise of jurisdiction over these proceeds is required to prevent immediate and irreparable harm to the pool of insurance proceeds. There is no reorganization purpose to be served at this time by the Court exercising jurisdiction over these indemnification proceeds.

Based on the foregoing, the Court concludes that the motion to dismiss under FRCP 12(b)(6) should be granted, in part, since plaintiffs have failed to establish recovery of the indemnification proceeds would be recovery of the debtor's interest in property, as required by § 547(b).

## II.

■ The trustee seeks to recover the $4.3 million paid to counsel for the class plaintiffs as payment on an antecedent debt. The law firm defendants resist on three grounds: First, that the debtor has failed to plead insolvency; second, that the law firms were not paid on behalf of an antecedent debt; and third, that the law firms were neither the immediate nor subsequent transferees of the funds.

■ Section 547(b) requires that the trustee prove seven elements in order to establish a voidable preference. The trustee must prove: (1) ICA made a transfer (2) of its property (3) to or for the benefit of a creditor; (4) for or on account of an antecedent debt; (5) while ICA was insolvent; (6) within 90 days of the petition's filing; and (7) the transfer enabled the defendants to receive more than they would have received in a Chapter 7 case. *In re Gulino,* 779 F.2d 546, 549 (9th Cir.1985); *In re Ehring,* 91 B.R. 897, 899 (9th Cir. BAP 1988). All elements must be clearly established for the trustee to recover.

■ The trustee's counsel concedes that the complaint fails to allege that ICA was insolvent at the time of the transfer. Apparently, the trustee has asked defendants for a stipulation permitting the complaint to be amended so as to allege that fact. In resisting the summary judgment motion, plaintiffs submitted the Declaration of Douglas J. McEachern, an audit partner of Deloitte & Touche. That declaration states that based on the audit team's preliminary three-week investigation, ICA was probably insolvent 90 days before filing its Chapter 11 case. McEachern also points to an internal financial statement of ICA showing a negative net worth of $15 million as of December 31, 1989.

The defendants point out numerous assertions in pleadings filed after the filing of ICA's petition in bankruptcy, asserting either ICA or its savings and loan subsidiary, ISA, were solvent. (See Separate Statement of Undisputed Material Facts and Evidence in Support of Motion to Dismiss, at 13–15). Indeed, even the initial schedules filed by the debtor claimed the company was solvent. It was only in the

amended schedules filed September 27, 1990, that ICA's unsecured indebtedness was shown to be $650 million, while its assets totaled only $50.5 million (See Decl. of Weiss, Ex. F–2, 8/15/91).

██ The contentions over whether or not ICA was insolvent within the 90 days prior to filing its petition only serve to demonstrate why summary judgment cannot be granted on the issue of the solvency of the debtor. It is well-settled law that where a genuine issue of material fact exists, all reasonable inferences are construed in favor of the party resisting a motion for summary judgment. *Los Angeles Airways, Inc. v. Davis*, 687 F.2d 321, 324 (9th Cir.1982).

However, merely finding that summary judgment is not appropriate on this issue does not necessarily lead to a conclusion that a motion under FRCP 12(b)(6) to dismiss this cause of action should not be granted. Pleading the element of insolvency in a preference action is critical. But for FRCP 15(a), which permits liberal amendments of pleadings when justice so requires, the failure to allege insolvency would be fatal to this cause of action. However, assuming the plaintiff will promptly seek to correct the deficiency in its preference cause of action, the Court will deny the motion to dismiss for failure to state a claim at this time without prejudice to renewal should an amendment motion fail to be granted.

As part of the preference action, the trustee alleges that the transfer of $4.3 million to the counsel for class plaintiffs was a transfer of property of the debtor in payment of an antecedent debt. By reason of the Court's ruling in paragraph I above, at least $3,807,498.06 is not. This is so because the Court held that the indemnification proceeds paid to the Settlement Fund and from which these fees, in part, were paid, were not a transfer of an interest of the debtor in property.

As to the remaining $503,835.61, the law firm defendants argue that the attorneys' fees paid were "secured" since, under state law, an attorney has a lien on the recovery to the extent necessary to pay reasonable attorneys' fees. Whether or not these counsel had liens on the settlement fund is irrelevant since, as noted by plaintiffs, "The earliest such a lien could have come into existence under any theory, would have been December 8, 1989—less than three months prior to the debtor's February 28, 1990 bankruptcy filing." (Plaintiff's Memo. of P. & A., at 18).

██ Further, it is undeniable that the class plaintiffs held claims which were antecedent debts. "Although 'antecedent debt' is not defined by the code, essentially a debt is 'antecedent' if it is incurred before the transfer." 4 *Colliers on Bankruptcy*, § 547.05 at 547–35, 36 (15th Ed.1983). Plaintiffs' counsel were paid for pre-petition services on behalf of class plaintiffs holding pre-petition claims. In the Court's view, it cannot be argued seriously that these were not antecedent obligations.

It further appears that no unsecured creditor of ICA—either unsecured or unsecured subordinated—would have received as generous a distribution in a Chapter 7 case as did these class claimants and their counsel. The disclosure statement for the confirmed plan of reorganization estimated that unsecured creditors holding claims of more than $500 would receive a 71 percent distribution on their claims. At the time of confirmation, there were claims estimated at $12,567,900, and cash for distribution of $9,000,000.

By contrast, these class plaintiffs who held claims which would have been subordinated under § 510(b) if asserted in this case, apparently have received a dividend of either three percent or 29.7 percent on every dollar of their losses, depending upon which calculation one believes. *See Are Great American Holders Luckless?*, SAN DIEGO DAILY TRANSCRIPT, Dec. 30, 1991, and *Letters To The Daily Transcript: Attorney Corrects What ICA Holders Received*, SAN DIEGO DAILY TRANSCRIPT, Feb. 13, 1992. The class plaintiffs in this class action suit would have been ineligible to receive *any* distribution on their subordinated claims in a Chapter 7 case until unsecured creditors were made whole. 11 U.S.C. § 726(a).

Bankruptcy Code § 550(a) provides that to the extent a transfer is avoided under

§ 547, it may be recovered for the benefit of the estate from the "initial transferee of such transfer or the entity for whose benefit the transfer was made or any immediate or mediate transferee of such initial transferee." The law firm defendants deny they are transferees under § 550(a). They argue that they acted as escrow agents only who later transferred the funds to a claims administrator.

The Court rejects these arguments for two reasons. First, the Court does not believe a fair construction of the Stipulation of Settlement supports the claim that the law firms were mere conduits of the funds. Although they were appointed escrow agents to "... oversee distribution of that portion of the Settlement Fund that is finally awarded by the Court to the Class" (at 25), the Stipulation for Settlement also provided that the Settlement Fund was to be applied to the payment of class plaintiffs' attorneys' fees, costs, expenses and interest (at 25). Exhibit "U" to the Declaration of Susan Ragsdale shows the February 26, 1990, withdrawal of the over $4 million used to pay these fees. It appears that these fees were paid by the defendants to themselves.

Second, the defendants have claimed an interest in the portion of the Settlement Fund awarded as attorneys' fees by arguing that an attorneys' lien existed on that portion of the fund. Although *In re Bullion Reserve of North America*, 922 F.2d 544, 547 (9th Cir.1991) holds that the transferee must be in a position to exercise "dominion" or "control" over the transferred funds, given their claim of an attorneys' lien on these funds and the fact that defendants apparently paid themselves out of the Settlement Fund, there is a strong suggestion that they exercised "dominion" and "control" within the definition of § 550(a). In adopting its definition for determining whether a "transferee" was immediate, the *Bullion Reserve* court cited the *In re Chase and Sanborn Corp.* opinion which stated:

> The test articulated by our court is a very flexible, pragmatic one; in deciding whether debtors had controlled property subsequently sought by their trustees, courts must "look beyond the particular

transfers in question to the entire circumstance of the transaction."

The control test, then, as adopted by this circuit, simply requires courts to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable. This approach is consistent with the equitable concepts underlying bankruptcy law.... 848 F.2d 1196, 1999 (11th Cir.1988)

Evaluating this transaction in its entirety, the Court concludes that the defendant law firms cannot deny transferee status under § 550(a) once all circumstances are considered. At the very least, a material issue of fact has been raised which precludes summary judgment on this issue.

This Memorandum Decision constitutes findings of fact and conclusions of law pursuant to FRBP 7052. Counsel for Milberg, Weiss, *et al.*, are directed to prepare an order in conformance with this Memorandum Decision within ten (10) days from the date of its entry.