In re SACRED HEART HOSPITAL OF NORRISTOWN, d/b/a Sacred Heart Hospital and Rehabilitation Center, Debtor.

**Bankruptcy No. 94–13275DAS.**

United States Bankruptcy Court, E.D. Pennsylvania.

May 17, 1995.

Vincent J. Marriott, III, Ballard Spahr Andrews & Ingersoll, Philadelphia, PA, for debtor.

Neal D. Colton, Dechert Price & Rhoads, Philadelphia, PA, for Creditors' Committee.

Robert Lapowsky, Cohen, Shapiro, Polisher, Shiekman & Cohen, Philadelphia, PA, for AllMed Financial Corp.

John J. Koresko, V, Koresko & Noonan, Norristown, PA, for certain former employees of debtor.

Claudia Z. Springer, Duane, Morris & Heckscher, Philadelphia, PA, for Mun. Bonds Investors Ins. Co.

J. Gregg Miller, Pepper, Hamilton & Scheetz, Philadelphia, PA, for Midlantic Bank.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION

Presently before this court in the voluntary Chapter 11 bankruptcy case of SACRED HEART HOSPITAL OF NORRISTOWN, d/b/a SACRED HEART HOSPITAL AND REHABILITATION CENTER ("the Debtor") is the Debtor's request that we confirm its Amended Plan of Reorganization ("the Plan") over several objections ("the Objections") raised by one of its creditors, ALLMED FINANCIAL CORPORATION ("AllMed"). We conclude that the principal Objection of AllMed—that the Plan improperly deducts insurance proceeds from the claims of creditors covered by insurance—must be rejected because we find that the proceeds are property of the Debtor's estate and may be utilized by it in funding the Plan. We reject all of the other Objections except contentions that on a proposed injunction against future creditor actions in the context of the Debtor's liquidating Plan is improper. While rejecting the substance of AllMed's Objection regarding the treatment of priority claims, we determine that the Plan's treatment of such claims must be clarified to assure Code compliance. In light of the Debtor's concession that the injunction provision is unnecessary and our conclusion that the treatment of priority claims must be only slightly revised, we indicate that we will confirm the Plan after certain minor amendments are made.

## B. FACTUAL AND PROCEDURAL HISTORY

Prior to commencing its bankruptcy case, the Debtor operated an acute-care non-profit hospital facility ("the Hospital") located in Norristown, Pennsylvania. On May 25, 1994, approximately one week after ceasing operations at the Hospital, the Debtor filed the instant bankruptcy case.

As we observed in three prior Opinions of this court arising from this case, reported at 181 B.R. 195, 196–97 (1995) (the Debtor's lawsuit seeking certain reimbursements from Blue Cross was referred initially to arbitration); 177 B.R. 16, 18–19 (1995) (a motion of certain former employees to file a class proof of claim was denied); and 175 B.R. 543, 546–48 (1994) (a home health care service provider was not allowed to assert a trust against certain of the Debtor's accounts receivable), the Debtor's Chapter 11 case has been in a liquidation mode from its inception. In furtherance of the liquidation process, the Debtor, in October, 1994, sold the Hospital, its principal asset, to Montgomery County for what was, at that time, an attractive bid price of $7.05 million, as a result of an auction sale conducted under the supervision of this court.

Thereafter, the Debtor filed its initial plan on January 13, 1995, and, after a hearing on its initial accompanying disclosure statement, filed the instant Plan and accompanying Amended Disclosure Statement ("the D/S") on February 9, 1995.

The Plan is essentially a liquidating Plan. Pursuant thereto, a liquidating committee consisting of three members will take control of the Debtor upon the effective date of the Plan, liquidate the Debtor's assets, and make distributions to the creditors in accordance with the Plan.

The Class 1 secured claim belongs to AllMed, whose assignor indirectly purchased certain accounts receivable from the Debtor shortly before the bankruptcy petition was filed. The accounts receivable which secure the Class 1 claim are to be turned over to AllMed in full satisfaction of the claim. The Debtor has alternately designated this claim as impaired and, most recently, unimpaired.

See pages 423–24 infra. Class 2 of the Plan consists of all claims of the holders ("the 1987 Bondholders") of certain Hospital Revenue Bonds issued in 1987 ("the 1987 Bond Claims"). The 1987 Bond Claims are to be paid in accordance with a settlement agreement among the Debtor, the 1987 Bond trustee, the Montgomery County Higher Education and Health Authority, and the Municipal Bonds Investors Insurance Corp., which this court approved, after a hearing of February 22, 1995, on Objections thereto by AllMed. Class 3 consists of the secured claims of the holders of certain Hospital Revenue Bonds issued in 1988. Either the collateral securing these claims, or the proceeds from the sale of such collateral, will be turned over to these bondholders in full satisfaction of their Class 3 claims. Class 4, consisting of all other secured claims, will receive treatment similar to the Class 3 claimants. Classes 5, 6 and 7 consist of various priority claims including wage and employee benefit priority claims. See 11 U.S.C. §§ 507(a)(3), (a)(4). These priority claims will receive a pro rata share of a specified portion of the Debtor's available cash on a quarterly basis until paid in full, but only after the full payment of certain priority claims having a higher priority, such as professional fees and certain taxes. Class 8 claimants, holding general unsecured claims, will receive pro rata shares of a specified portion of the Debtor's available cash until such funds are exhausted or payment in full, but only after priority claims and administrative expenses have first been paid in full. Class 9 consists of the claims of general unsecured creditors which may be covered by "applicable insurance polic[ies]," presumably owned by the Debtor. These claims of the Class 9 creditors will initially receive what they can recover from "applicable insurer[s]." Any portions of such claims not paid by "applicable insurer[s]" are treated as Class 8 claims. Finally, Class 10 consists of all equity interests in the Debtor. Equity holders are permitted to maintain their interests in the Debtor but will receive no property or payments on account of such interests.

At the hearing on the adequacy of the D/S on February 22, 1995, AllMed, which has, usually without support from any other inter-

ested parties, been engaged in numerous disputes with the Debtor throughout the course of this bankruptcy, raised certain objections to the D/S. AllMed's primary objection, which, in our view, had little to do with disclosures, focused upon the Plan's requirement that unsecured claimants with Class 9 claims were obliged to pursue insurance proceeds ("the Proceeds") first, and only thereafter seek payment from the Debtor on deficiencies in accordance with the Class 8 Plan treatment.

It is clear that AllMed has a very real interest in this primary objection, which is repeated in the objections to confirmation before us, because its unsecured claim has been classified by the Debtor as a Class 9 claim. This turn of events arises because AllMed claims that its assignor purchased the Debtor's receivables in reliance upon alleged misrepresentations made by certain of the Debtor's officers. AllMed now has sought to recover at least part of its claim from the Proceeds of the Debtor's directors' and officers' liability insurance policy ("the D & O Policy") by suing the Debtor's insurers ("the Insurers") and the offending officers in federal court ("the Insurance Litigation"). An attempt of AllMed to obtain relief from the automatic stay to join the Debtor in the Insurance Litigation was denied by this court on January 4, 1995, although this Order is the subject of a pending appeal by AllMed.

AllMed argues that it should be permitted to receive its percentage payment to Class 8 claimants based on the entire amount of its unsecured claim, and then seek whatever additional amounts it can recover from the Insurers. In so arguing, AllMed acknowledges that it is not entitled to more than full payment of its unsecured claim from all sources. However, the prospect of overpayment is not an issue. Based on the Debtor's estimation of the dividend to be paid to unsecured creditors and AllMed's estimation of the maximum amount it can recover from the Insurers, AllMed believes that its unsecured claim will not be paid in full even if it prevails on this objection. The Debtor does not con-

test this point. The bottom line, then, appears to be a $100,000 potential differential in its net recovery calculated by AllMed in its briefing as follows:

| | |
|---|---|
| AllMed's alleged unsecured claim | $1,200,000 |
| Alleged maximum insurance recovery | 500,000 |
| **Debtor's Payment Scheme:** | |
| AllMed unsecured claim | $1,200,000 |
| less amounts recovered from Insurers | − 500,000 |
| equals "deficiency" unsecured claim entitled to Class 8 treatment | $ 700,000 |
| Class 8 dividend (20% est.) on unsecured "deficiency" claim | $ 140,000 |
| Total amount paid on AllMed unsecured claim | **$ 640,000** |
| **AllMed's Payment Scheme:** | |
| Class 8 dividend (20% est.) on entire amount of AllMed's unsecured claim | $1,200,000 ×   .2 |
| | $ 240,000 |
| Amount recovered from Insurers | $ 500,000 |
| Total amount paid on AllMed unsecured claim | **$ 740,000** [1] |

Because AllMed's objections to the D/S were nothing more than premature attempts to contest confirmation, and because no other valid objections to the D/S were raised, we approved the D/S by an Order dated February 22, 1995 ("the D/S Order"). In the D/S

Order, we established March 31, 1995, as the deadline by which all ballots on Debtor's Plan were to be received and all objections to confirmation were to be filed, and we set April 12, 1995, as the date for the confirmation hearing.

According to the uncontested Report of Plan Voting filed by Debtor on April 6, 1995 ("the Report"), an impressive majority of the total creditors voting accepted the Plan.

---

1. We use AllMed's calculations for illustrative purposes only and do not mean to suggest that we either agree or disagree with its various estimates. In particular, we are not sure why

AllMed's possible recovery against the Insurers would be limited to $500,000 when the liability limit on the D & O Policy is $10,000,000.

AllMed's Class 1 ballot rejecting the Plan, however, represents a notable exception to this response. The Debtor, in an apparent rejoinder to AllMed's Class 1 ballot, attempted to reverse the designation of AllMed's claim as impaired in the D/S and the Plan by asserting, in the Report, that the Class 1 claim, was in fact *unimpaired*. On this basis, the Class 1 claimant was reported as being deemed to have voted in favor of the Plan. Classes 2, 3, 4 and 9[2] voted unanimously in favor of the Plan. A very high percentage in number (97.69%) and in amount (98.88%) of the Class 5 claimants filed ballots accepting the Plan. Finally, not counting AllMed's *pro forma* Class 8 ballot, 96.8% in number and 97.06% in amount of the remaining Class 8 claimants voted to accept the Plan. Even when AllMed's Class 8 ballot is added to the mix, the Plan was nevertheless accepted by 96.83% in number and 72.86% in amount of the Class 8 claimants. The Debtor indicated that it was unaware of any Class 6 or 7 claimants and received no votes from claimants purporting to hold such claims. Class 10, an unimpaired class consisting of "members of the Debtor Corporation," was deemed to have accepted the Plan.

In the face of this overwhelming show of support for the Plan, AllMed filed the Objections on March 31, 1995. As noted above, the Objections repeated AllMed's contention that the Plan's treatment of the Class 9 claims was improper ("the Marshaling Issue"). AllMed also objected to the following alleged defects barring confirmation in the Plan: (1) the Plan sought to improperly construct a discharge injunction in contravention of the Bankruptcy Code ("the Injunction Issue"); (2) the Plan failed to guarantee that priority claims would be paid in full in accordance with the Bankruptcy Code ("the Priority Claim Issue"); (3) the Debtor improperly attempted to change the designation of the Class 1 claim from impaired to unimpaired in the Voting Report ("the Impairment Issue"); and (4) the Plan improperly classified and treated both the secured and unsecured

claims of the 1987 Bond Claims in one class ("the Classification Issue").

On April 12, 1995, we conducted a hearing on confirmation of the Plan in light of the Objections. The Debtor called only its president, Terrence Cunningham, to the stand. AllMed called no witnesses. Both parties entered several documents into evidence. At the conclusion of the hearing, we allowed any interested parties to file briefs on all contested confirmation issues. Simultaneous opening and reply briefs were due on April 26, 1995, and May 10, 1995, respectively. We have received timely submissions from only the Debtor and AllMed, and we are now prepared to rule on confirmation of the Debtor's Plan.

## C. DISCUSSION

### 1. THE MARSHALING ISSUE

The nub of AllMed's major argument is that the Proceeds are not property of the Debtor's estate. From this conclusion, AllMed argues that the Debtor cannot require AllMed or any creditor to pursue this third-party source first and only return to the estate for a percentage payment on the remainder thereafter. Implicit in AllMed's argument is a contention that this bankruptcy court has no jurisdiction over this non-estate property and thus cannot marshal the Proceeds along with other property of the Debtor's estate. AllMed relies primarily on two Supreme Court cases decided under the predecessor Bankruptcy Act which stand for the proposition that a creditor can seek to prove its entire claim in the bankrupt's case notwithstanding the existence of third party collateral or guarantees of payment so long as the claimant does not seek to recover more than one full payment of its claim from whatever source. *See Reconstruction Finance Corp. v. Denver & R.G.W. R.R.*, 328 U.S. 495, 66 S.Ct. 1384, 90 L.Ed. 1400 (1946) (cited hereafter as *"RTC"*); and *Ivanhoe Building & Loan Ass'n v. Orr*, 295 U.S. 243, 55 S.Ct. 685, 79 L.Ed. 1419 (1935). It also cites to *In re F.W.D.C., Inc.*, 158 B.R. 523, 526–27 (Bankr.S.D.Fla.1993); and *In re*

---

**2.** In light of AllMed's objection to the Class 9 treatment, it refused to file a ballot in this class, thus resulting in acceptance of the Plan by 100% of the remaining Class 9 creditors. Instead, AllMed filed a Class 8 ballot in the amount of its entire unsecured claim rejecting the Plan.

*Coastland Chrysler Plymouth, Inc.*, 76 B.R. 212 (Bankr.S.D.Fla.1987), as Code cases reiterating the continued vitality of *RTC* and *Ivanhoe*.

We agree with AllMed that, if the Proceeds are not property of the estate, then AllMed is entitled to payment of its entire unsecured claim in accordance with the Plan's treatment of the Class 8 claims, and may then seek payment of any deficiency from the Insurers. Thus, the initial, if not dispositive, question is whether the Proceeds are property of the Debtor's estate.[3]

Several courts have concluded that liability insurance proceeds, which can only be paid to aggrieved third parties and not the purchaser of the liability policy, are not property of the estate. The leading case cited by AllMed, *In re Louisiana World Exposition, Inc.*, 832 F.2d 1391 (5th Cir.1987) (cited hereafter as "*LWE*"), holds that proceeds from directors' and officers' liability insurance policies are not property of Debtor's estate. Although the progeny of this case often cite to *LWE* as support for broad pronouncements that go far beyond the parameters of the *LWE* decision itself, that decision is in fact quite narrow and not inconsistent with our conclusion today that the Proceeds in issue *are* property of the Debtor's estate.

The policy involved in the *LWE* case provided liability coverage for *LWE*'s directors and officers, as well as reimbursement to the Debtor to the extent that it had to indemnify its directors and officers under state law, its bylaws, or its corporate charter. *Id.* at 1398. Unlike the D & O Policy at issue in the instant dispute, the policy at issue in *LWE* did not provide liability coverage to the debtor itself. *Id.* After the debtor filed for bankruptcy, the creditors' committee requested and received permission to sue the debtor's directors and officers in the name of the debtor. *Id.* at 1393–94. The committee filed a complaint in the district court naming as defendants certain directors and officers as well as the insurer.

As the litigation proceeded and the directors and officers incurred legal expenses, they began to make claims against the policy for these expenses. *Id.* at 1394. Because every dollar paid out for defendant reimbursement under the policy meant one less dollar available to the committee if its suit succeeded,[4] the committee filed a complaint

---

3. The Debtor alternatively argues that the Plan constitutes a permissible marshaling of the Proceeds, even if they are not property of the estate. Initially, the logic of this argument is appealing. As noted by the Debtor, the Plan does not interfere with or limit AllMed's rights against the third-party Insurers or the Proceeds. Instead, the Plan merely defers AllMed's right to share in proceeds of the estate until after it has concluded the Insurance Litigation. Although this appears to be nothing more than a restriction on a creditor's access to property of the estate, a restriction which, at first blush, appears to be well within our jurisdiction to approve, we believe that this inviting path leads to a slippery slope. Whether the Plan restricts access to property of the estate or forces AllMed to pursue (undoubtedly at its own expense) non-Debtor assets first, the end result is the same. The Plan, and any order we enter approving it, would very much affect AllMed's rights in, and access to, assets not otherwise within our jurisdiction. Although we acknowledge that AllMed's preferred order of proceeding may well diminish the pot of funds available to the remaining unsecured creditors, this result alone does not necessarily indicate that AllMed's preference is flawed or at odds with the Bankruptcy Code. If AllMed has a right to seek full payment from the Debtor before or in lieu of seeking payment from third-party sources, nothing in the Bankruptcy Code alters this right.

Indeed, notwithstanding the Debtor's alternative perspective on the problem, the very same marshaling issue is at the core of *RTC* and *Ivanhoe*. These cases cannot be distinguished on the grounds articulated in the Debtor's policy arguments based upon the facts of those cases when decided, since these arguments apparently did not move the Supreme Court. Thus, unless the Proceeds are property of the Debtor's estate, we cannot force AllMed to seek repayment from that source before submitting its full unsecured claim for payment under the Plan.

4. It is not unusual for directors' and officers' liability policies to have one policy limit from which all payments are deducted, regardless of whether they are paid to successful litigants on their judgments, to directors and officers for reimbursement of defense costs or the policyholder for its indemnification obligation. *Id.* at 1398 ("Each policy ... provided a single total amount of coverage which was applicable to both the indemnification and the liability protections jointly, so that payment under either reduced the amount of coverage remaining available under both."). Indeed, the D & O Policy likewise has one policy limit from which all claims are paid, *including those claims arising under the Debtor's liability component of the D & O Policy*.

seeking to enjoin the insurers from paying the policy proceeds to the directors and officers. *Id.* at 1394. The bankruptcy court dismissed the committee's complaint and the district court affirmed. *Id.* On further appeal, the Court of Appeals concluded that the proceeds, as opposed to the policies themselves, were not property of the estate, and therefore dismissal of the committee's complaint was proper. *Id.* at 1394, 1399–1400.

Despite the admittedly broad scope of the definition of "property of the estate," the *LWE* court noted that only the directors and officers were named as insureds under the liability portion of the policy and that *LWE* had no right to those proceeds. The court thusly concluded that the proceeds did not constitute property of the estate:

> "the estate's legal and equitable interests in property rise no higher than those of the debtor," ... and LWE, the debtor, had no ownership interest whatever in the proceeds of the liability coverage. With regard to the liability proceeds, the obligation of the insurance companies was only to the directors and officers and they are the named and the only insureds.... The fact that LWE purchased the policies does not change the outcome.

*Id.* at 1399 (citations omitted). Furthermore, the Court said of several cases, a number of which were cited by the Debtor and hold that liability policies are property of the estate, that

> these decisions are not controlling here. The question is not who owns the policies, but who owns the liability proceeds. Although the answer to the first question quite often supplies the answer to the second, this is not always so.... [W]e emphasize the distinction between owning a policy and owning the proceeds.

*Id.* at 1399–1400. *Accord, First Fidelity Bank v. McAteer,* 985 F.2d 114, 117 (3d Cir.1993) ("Ownership of a life insurance policy ... does not necessarily entail ownership of the proceeds of the policy.").

The *LWE* court took great pains to carefully delineate its narrow holding and to differentiate the facts before it from others which commonly arise in disputes over liability proceeds. For example, The Court reiterated that the policy at issue did not cover the debtor for its own liability exposure, thus suggesting that its conclusion might have been different if such coverage had been included. *Id.* at 1400 ("[Those cases holding that liability proceeds are property of the estate because the proceeds are payable to the debtor are] different from the liability coverage here, which does not cover the liability exposure of the corporation at all, but only of its directors and officers and is payable only to them.").

Additionally, the Court distinguished the case before it from cases such as *A.H. Robins Co. v. Piccinin,* 788 F.2d 994 (4th Cir.), *cert. denied,* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986); and *In re Johns–Manville Corp.,* 40 B.R. 219 (S.D.N.Y.1984), where *third parties* were attempting to access the liability proceeds. The court noted that, in the case of third-party suits, the debtor risks losing the indemnification proceeds once the liability proceeds are exhausted. *Id.* at 1400. *Accord, In re Johns–Manville Corp.,* 26 B.R. 420, 429 (Bankr.S.D.N.Y. 1983). In the *LWE* case, the directors and officers were not seeking access to the liability proceeds. *Id.* at 1400. Indeed, it was the debtor itself that sought those proceeds in order to *augment* the estate. *Id.* Rather, the directors and officers were merely seeking indemnification. As the *LWE* court aptly pointed out, "any payment under the liability coverage reduces the amount of the potential indemnification claim to the same extent that policy amounts available for indemnification are thus reduced." *Id.* In conclusion, the court held that the debtor's estate was not diminished by the payment of the indemnification proceeds to the directors and officers, and therefore such proceeds were not property of the debtor's estate.

■ The *LWE* case is quite easily distinguished from the case at bar. First, we note that AllMed *is* a third party, so its suit to recover the Proceeds is exactly the scenario which the Fifth Circuit recognized as problematic.[5] More important, however, is the fact

---

5. The concerns articulated by the *LWE* court,

albeit quite significant in the mass tort scenario,

that the Debtor's own liability exposure is also covered by the D & O Policy. Proceeds available for the Debtor's liability exposure are not segregated from the Proceeds available to the directors and officers. Thus, the Debtor is indeed an insured and has a sufficient interest in the Proceeds as a whole to bring them into the estate. *See In re Vitek, Inc.*, 51 F.3d 530, 534, n. 17 (5th Cir.1995) ("Faced with the typical situation in which a debtor corporation's liability policies provide the debtor and thus the estate with direct coverage against third party claims, virtually every court to have considered the issue has concluded that the policies and clearly the proceeds of those policies are part of debtor's bankruptcy estate, irrespective of whether those policies also provide liability coverage for debtor's directors and officers." Furthermore, the court limits the holding of the *LWE* case to the "narrow factual context" in which it arose, noting that the issues addressed by *LWE* are "in ferment" and that its holding has "not been broadly applied...."). *Accord, In re Pintlar Corp.*, 175 B.R. 379, 385 (Bankr.D.Idaho 1994).

Even if we could not distinguish *LWE*, we would not be inclined to adopt its reasoning, nor, of course, are we required to do so. First, we note that, even though the debtor's liability exposure was not covered by the policy at issue in *LWE*, that debtor still

might have been entitled to the proceeds if it had been required to indemnify the officers and directors directly. The *LWE* court attempts to sidestep this issue by noting that "this case does not involve the indemnification proceeds, and, in any event, we do not believe the existence of *indemnification* coverage affects the answer to the sole and narrow question here, which is whether the *liability proceeds* are part of LWE's estate in bankruptcy." *LWE*, 832 F.2d at 1399 (emphasis in the original). The court's distinction between liability and indemnification proceeds, however, is illusory. As noted above, both types of coverage were provided from the same pot of proceeds. Thus, payment of either type of claim would have diminished the pot, and arguably exposed the debtor to claims which otherwise might have been paid by the insurer. We think that such an indemnification interest in proceeds is sufficient to bring those proceeds into the estate.[6] *Accord, In re Minoco Group of Companies, Ltd.*, 799 F.2d 517, 519 (9th Cir. 1986);[7] and *In re Circle K Corp.*, 121 B.R. 257, 259–60 (Bankr.D.Ariz.1990). *Cf. In re Zenith Laboratories, Inc.*, 104 B.R. 659, 665–66 (D.N.J.1989) (court avoids indemnification issue by noting that the debtor had no absolute obligation to indemnify its directors and officers); and *In re Imperial Corp. of Amer-*

---

are not nearly so critical here, where it is not at all clear that AllMed's suit will gobble up all of the Proceeds, thus exposing the Debtor to uncovered indemnification claims by its directors and officers.

**6.** Nor is this conclusion at odds with *McAteer, supra*. In that case, the Court of Appeals held that the proceeds of the debtor's credit life insurance policy were not property of the estate. 985 F.2d at 117. However, that holding was premised upon the fact that the creditor, who insisted upon the credit life insurance policy as collateral for a loan, was the only party with a right to the proceeds. *Id.* at 116–17. Unlike the debtor in *LWE*, who could seek reimbursement of its indemnification payments to the directors and officers from the policy proceeds, the *McAteer* debtor had absolutely no right to the proceeds in question. *See also In re Edgeworth*, 993 F.2d 51, 55–56 (5th Cir.1993) (debtor had no interest in malpractice insurance policy proceeds and therefore the proceeds were not property of the estate). The Debtor's interest in the Proceeds is thus far more akin to that of the *LWE* debtor than that of the *McAteer* debtor.

**7.** Courts which have ruled the other way on this issue have tried to distinguish *Minoco* by noting that the court, in that case, speaks only of the debtor's ownership of the policy, not the proceeds. We find these attempts to distinguish *Minoco* lacking in merit. Although the *Minoco* court only speaks of the policy, it is clearly lumping the policy and proceeds together in its relevant discussions. Indeed, without access to the indemnification proceeds, the court's statement that "the policies ... benefit Minoco because the polices insure Minoco against indemnity claims made by officers and directors" would be untrue. 799 F.2d at 519. Even the *LWE* court appears to tacitly acknowledge that such technical distinctions are often not maintained and therefore insignificant when absent. *See also Vitek, supra*, 51 F.3d at 534 ("Most courts do not even recognize a technical distinction between ownership of insurance policies and ownership of the proceeds of those policies: They simply conclude that such policies and, by implication, the proceeds of such policies are valuable properties of debtors' bankruptcy estates.").

*ica,* 144 B.R. 115, 118–19 (Bankr.S.D.Ca. 1992) (court suggests that the debtor's indemnification interest in proceeds may have dictated a different result from *LWE* were it not for an "insured versus insured clause" which excused the insurer from paying over such proceeds to the debtor in any event).

Furthermore, we are somewhat troubled by the *LWE* court's attempt to distinguish between a third party's attempt to access proceeds under the liability coverage and the directors' and officers' attempt to access the proceeds under the indemnification coverage. 832 F.2d at 1400. Implicit in the court's distinction is the contention that the same property may or may not constitute property of the estate depending on who seeks to obtain it and for what purpose. The very fact that a debtor has an interest in specific property under one scenario, regardless of whether that interest is implicated under another scenario, should, in our view, resolve the issue. Nor does 11 U.S.C. § 541 appear to support this "moving target" approach to property of the estate.

Finally, as intimated above, we certainly do not agree with the breadth with which certain decisions on this issue have read *LWE.* For example, two decisions from the Northern District of California conclude that director and officer liability proceeds are not property of the estate even when the debtor's liability exposure is also covered by the same proceeds, and even though it is third parties which seek to obtain the proceeds. *See In re Daisy Systems Securities Litigation,* 132 B.R. 752, 754–55 (N.D.Cal.1991); and *Duval v. Gleason,* 1990 WL 261364, slip op. at *1, *4–*5 (N.D.Cal. Oct. 19, 1990). Despite the limiting language contained in *LWE* regarding these very contingencies, both of these decisions cite to *LWE* as support for their holdings. *Compare Pintlar, supra,* 175 B.R. at 385 n. 3 (court notes and criticizes this incongruity).

By way of contrast, this court, in *In re Jones,* 179 B.R. 450, 454 (Bankr.E.D.Pa.

1995), notes that numerous cases have held that

> insurance proceeds generated during the course of a bankruptcy case … are themselves property of the debtor's estate. *See, e.g., Tringali v. Hathaway Machinery Co.,* 796 F.2d 553, 560–61 (1st Cir.1986); *Bradt v. Woodlawn Auto Workers F.C.U.,* 757 F.2d 512, 515 (2d Cir.1985); *Grillo v. Zurich Insurance Co.,* 170 B.R. 66, 69 (S.D.N.Y.1994); *In re Reed,* 94 B.R. 48, 52–53 (E.D.Pa.1988); *In re Hill,* 174 B.R. 949 (Bankr.S.D.Ohio 1994); *In re Natale,* 174 B.R. 362, 365 (Bankr.D.R.I.1994); *In re Calder,* 171 B.R. 36, 37 (Bankr.N.D.Tex. 1994); *In re Woods,* 97 B.R. 850, 851–52 (Bankr.W.D.Va.1989); *In re Fox,* 80 B.R. 753, 756–57 (Bankr.W.D.Pa.1987); and *In re Hawkeye Chemical Co.,* 71 B.R. 315, 319–20 (Bankr.S.D.Iowa 1987).

Finally, one aspect of the general logic of AllMed's argument escapes us. There is no mistake that, if an insured claim had been liquidated in whole or in part by an insurance payment prior to the effective date of confirmation of the Plan, the claim of the creditor receiving the insurance payment would have had to have been reduced dollar-for-dollar by the amount of the insurance proceeds received. AllMed argued that payments received after the effective date cannot be utilized to effect such reductions. It seems illogical to us to support a result whereby a creditor's claim is enhanced, *see* the calculations at pages 416–17 *supra,* simply because of the date that the insurance proceeds are paid to the claimant. *Cf. In re After Six, Inc.,* 177 B.R. 219, 230–31 (Bankr.E.D.Pa. 1995) (a claim should be reduced by the net amount of credits against it).

■ Following the general rule that insurance proceeds payable to a debtor are generally property of the debtor's estate and for the reasons discussed above, we conclude that the Proceeds are property of the Debtor's estate. Therefore, the Debtor may, by means of its Plan, regulate access to this property in relation to other estate assets.[8]

---

8. Answering this question, though crucial to meeting the arguments of AllMed, does raise at least a few more questions. For example, we note that the Debtor makes no provision in its

Plan to estimate AllMed's eventual Class 8 claim or otherwise reserve against it. It seems entirely possible that, as a result, all funds available to the Class 8 claimants will be exhausted before

## 2. *THE INJUNCTION ISSUE*

■ Section 10.1 of the Debtor's Plan gives rise to the Injunction Issue. It provides as follows:

10.1 All creditors are enjoined from commencing or continuing any action, employment of process, or act to collect or recover any claim from property of the estate which revests in the Debtor pursuant to this Article, except as set forth in this Plan.

AllMed argues that this Plan provision amounts to a discharge of the liquidating, Chapter 11 Debtor in violation of 11 U.S.C. § 1141(d)(3). AllMed also fears that the broad language of this Plan provision will prevent it from pursuing the Insurance Litigation post-confirmation.

The Debtor's responses to this objection were inconsistent. First, at the confirmation hearing, the Debtor appeared to suggest that the operation of § 10.1 would require AllMed to liquidate its claim in this court before it could proceed further with the Insurance Litigation. However, next, in its opening brief in support of confirmation of the Plan, the Debtor argued that AllMed was misconstruing the breadth of § 10.1, and that the

AllMed is able to liquidate its claims in the Insurance Litigation and submit the deficiency for payment in accordance with the Class 8 Plan treatment. This potential problem, at a minimum, would seem to implicate 11 U.S.C. §§ 1129(a)(11) (feasibility) and (b)(1) (unfair discrimination).

However, a feasibility analysis is fact intensive. AllMed submitted no evidence to contradict Debtor's proof that the Plan is feasible. Indeed, AllMed did not even object to the Plan on this ground. We will therefore not second-guess the Debtor and its accountants in this regard.

Although mistakenly (in light of the absence of a dissenting class of unsecured claims) citing to 11 U.S.C. § 1129(b)(2)(B) in its support, AllMed does make a brief "unfair discrimination" argument in the Objections with reference to the treatment of insured and uninsured claims. We note, however, that the unsecured claims with access to insurance coverage are in fact significantly different from the general unsecured claims. Dissimilar treatment for dissimilar claims does not run afoul of the unfair discrimination provision. *See, e.g., In re LeBlanc,* 622 F.2d 872, 879 (5th Cir.1980) ("A bankruptcy court can permit discrimination when the facts of the case justify it."); *In re Bryson Properties XVIII,* 129 B.R. 440, 445 (M.D.N.C.1991), *rev'd on other grounds,* 961 F.2d 496 (4th Cir.), *cert.*

provision merely stood for the principle that all creditors are bound by the confirmed Plan as set forth in § 1141. Finally, in its reply brief in support of confirmation, the Debtor argued that § 10.1 was intended "to protect the jurisdiction of this Court to perform its assigned task in the bankruptcy process: manage the determination and liquidation of, and distribution with respect to, claims."

The only thing that is clear to us about § 10.1 is that the provision's meaning and effect is unclear, even to the Debtor itself. That state of affairs, in and of itself, is sufficient reason to order § 10.1 stricken from the Plan. To the extent that § 10.1 seeks to "protect" this court's jurisdiction, no such protection is needed. To the extent that it seeks to define (and, perhaps, enlarge) our jurisdiction, the Debtor has no right to do so. To the extent that it seeks to paraphrase the operation of certain Bankruptcy Code provisions, it is unnecessary, and possibly dangerous, to do so. And, to the extent that it seeks to impede the Insurance Litigation, it is not at all clear to us that such an end is legal. *See, e.g., Edgeworth, supra,* 993 F.2d at 53–55; and *McAteer, supra,* 985 F.2d at 118–19. *Cf. In re Fernstrom Storage and*

*denied,* —— U.S. ——, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992) ("Where legal claims are sufficiently different as to justify a difference in treatment under a reorganization plan, reasonable differences in treatment are permissible."); *In re Nelson,* 133 B.R. 786, 792 (Bankr.S.D.Miss.1991) ("[I]t is noted that section 1129(b) does not proscribe discriminatory treatment between claims."); and *In re Aztec Co.,* 107 B.R. 585, 588–89 (Bankr.M.D.Tenn.1989) ("Section 1129(b)(1) prohibits only unfair discrimination, not all discrimination.").

Furthermore, if AllMed recovers even part payment of its claim from the Insurers along with its pro rata share of the rest, it will do better than the general unsecured claimants. Discrimination in favor of AllMed's claim may not serve as a basis for its claim of unfair discrimination. *See In re Adamson Co.,* 42 B.R. 169, 172–73 (Bankr. E.D.Va.1984). Finally, AllMed can always forego the Insurance Litigation and submit its entire unsecured claim for pro rata payment under the Plan, thus securing the same treatment as the other unsecured claimants. *Cf.* 5 COLLIER ON BANKRUPTCY, ¶ 1129.03[3], at 1129–82 (15th ed. 1995) (providing full payment to smaller unsecured claims for administrative convenience is not unfair discrimination if larger, dissenting claims can opt to reduce their own claims and join the convenience class).

*Van Co.*, 100 B.R. 1017, 1021, 1023–24 (Bankr.N.D.Ill.1989).

We gather from Debtor's various arguments that § 10.1 is not intended to create or enlarge any substantive rights not already guaranteed by the Bankruptcy Code or by operation of confirmation. As such, it is unnecessary. Thus, to eliminate, as Debtor puts it in its brief, "an issue where none exists," we will order Debtor to strike § 10.1 by amendment before we confirm the Plan.

### 3. *THE PRIORITY CLAIM ISSUE*

Next, AllMed argues that the plan does not assure that the priority claimants in Classes 5, 6 and 7 will be paid in full, as required by the Bankruptcy Code, thus requiring us to deny confirmation of the Plan.

▆▆▆ First, we note that AllMed itself does not have a priority claim. Therefore, its standing to raise this Objection, like its motivation for raising this Objection in the first place, is questionable. *See, e.g., In re B. Cohen & Sons Caterers, Inc.*, 124 B.R. 642, 647 (E.D.Pa.1991) ("[C]reditors lack standing to challenge those portions of a reorganization plan that do not affect their direct interest."). *See also In re Union Meeting Partners*, 165 B.R. 553, 574 (Bankr.E.D.Pa.1994), *aff'd*, C.A. No. 94–2419 (E.D.Pa. July 29, 1994), *aff'd*, Nos. 94–1790 and 94–1791, 52 F.3d 317 (3d Cir. March 31, 1995), and cases cited therein. Because we have an independent duty to ensure that the Plan meets all of the requirements of confirmation, *see id.*, we will consider all aspects of the Priority Claim Issue.

Section 1129(a)(9)(B) of the Bankruptcy Code provides, in pertinent part, that

> [e]xcept to the extent that a holder of a particular claim has agreed to a different treatment of such claim, [the court shall confirm a plan only if] the plan provides that—
>
> .       .       .       .       .
>
> (B) ... each holder of a claim of such class will receive—
>
> > (i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim....

AllMed does not argue that the Plan's treatment of the priority claims is facially flawed. Indeed, the Plan does provide for the payment of the "full amount" of the priority claims over time.[9] Instead, AllMed argues that the Plan does not guarantee the full payment promised. Thus, this Objection is not based upon § 1129(a)(9) at all, but on the feasibility requirement of § 1129(a)(11).

As we noted at pages 421–22 n. 8 *supra*, AllMed has submitted nothing to contradict the Debtor's evidence that it has sufficient funds to carry out its Plan. *Compare In re Mayer Pollock Steel Corp.*, 174 B.R. 414, 421–23 (Bankr.E.D.Pa.1994) (despite substantial opposing expert testimony presented by an objecting creditor, this court concludes "that the instant Plan satisfies the § 1129(a)(11) feasibility requirement, even in the face of [such] critical analysis."). *Cf. In re Fricker*, 116 B.R. 431, 438 (Bankr.E.D.Pa. 1990) (in a Chapter 13 case, a dissenting creditor has the initial burden of articulating

9. The exact language of the Plan's priority claim treatment provisions is as follows: "Unless a holder of a Class 5[, 6 or 7] claim agrees to less favorable treatment, each holder of a Class 5[, 6 or 7] claim shall receive on the first day of each calendar quarter such holder's Pro Rata share of Available Cash after payment in full of Unclassified Claims ... *until such holder is paid the full amount of its Allowed ... Claim.*" (emphasis added). There is no dispute that, when a plan proponent seeks to pay its priority claims pursuant to § 1129(a)(9)(B)(i), interest must be paid to the priority claim holders in order that the total stream of payments which they receive under the plan equals, at present value, the amount of their allowed claims on the effective date of the plan.

*See, e.g., In re Hardzog*, 901 F.2d 858, 859 & n. 6 (10th Cir.1990); *In re River Village Associates*, 161 B.R. 127, 135 (Bankr.E.D.Pa.1993), *aff'd*, 181 B.R. 795 (E.D.Pa.1995); and *In re Musil*, 99 B.R. 448, 451 (Bankr.D.Kan.1988). Although not stated with the greatest clarity, it is possible that the priority claim treatment quoted above contemplates the payment of such interest. Because this treatment is nevertheless not perfectly clear and observing that we are otherwise requiring the Debtor to amend its Plan in certain other minor respects, *see* page 423 *supra*, we will also order it to amend the language of the priority claim treatment provisions to clearly provide for the payment of a market rate of interest to such claim holders until their claims are paid in full.

a feasibility defect, although the ultimate burden of proving feasibility falls upon the debtor). Furthermore, we have stated several times before that the feasibility standard of § 1129(a)(11) is not rigorous. *See, e.g., Mayer Pollock, supra,* 174 B.R. at 420–23; and *In re Orfa Corp. of Philadelphia,* 129 B.R. 404, 410–11 (Bankr.E.D.Pa.1991), and cases cited therein. Because we find, with little hesitation, that the Debtor has satisfied the § 1129(a)(11) requirement, we will not deny confirmation of the Plan on that ground. We will, however, require that the Debtor effect the clarification to the treatment of priority claims described at page 423 n. 9 *supra.*

### 4. *THE IMPAIRMENT ISSUE*

For some reason not explained to us or, apparently, AllMed, the Debtor has changed the designation of AllMed's Class 1 claim from impaired to unimpaired more than once. In the original version of its Plan, the Debtor designated the Class 1 claim as "unimpaired," thus sparking an objection from AllMed. The designation was changed to "impaired" in the present version of the Plan. Then, *after* creditor voting on the Plan which designates the Class 1 claim as impaired, the Debtor has again sought to change the designation by referring to the claim as unimpaired in the Report.

■ Although a secured creditor can be forced to take back its collateral in full payment of its secured claim pursuant to the cramdown provisions of § 1129, such treatment most certainly impairs the secured claim. *See In re Western Real Estate Fund, Inc.,* 109 B.R. 455, 463–64 (Bankr.W.D.Okla. 1990); and *In re Coral Petroleum, Inc.,* 60 B.R. 377, 381 (Bankr.S.D.Tex.1986) (both cases holding that the return of the respective secured creditor's collateral constituted provision to it of the "indubitable equivalent" of its claim, suggesting by implication that such treatment impaired the claim and thus necessitating resort to the Code's cramdown provisions). However, because the Plan in issue does not designate the claim in question as unimpaired, AllMed's claim must be considered as impaired. The Report does not constitute a valid Plan amendment. However-

er, since AllMed does not dispute that the terms of §§ 1129(b)(1), (b)(2)(A) are satisfied with respect to it, the Plan may be confirmed despite the dissenting vote of Class 1. Therefore, the issue is academic and we need not consider it further.

### 5. *THE CLASSIFICATION ISSUE*

■ Finally, AllMed objects to the classification of all of the 1987 Bond Claims in a single class. The Plan does indeed classify the 1987 Bond Claims in a single class, but this treatment is in accordance with a settlement agreement entered into by the bond claimants and the Debtor and approved by this court on February 23, 1995, albeit over the Objections of AllMed to the settlement. As AllMed correctly points out, the collateral securing these claims does not equal the allowed amount of the claims. Thus, the global treatment of the 1987 Bond Claims technically addresses both the secured and unsecured claims of these creditors in one class. According to AllMed, this treatment of the 1987 Bond Claims violates 11 U.S.C. § 1122(a), which permits only substantially similar claims to be classified in the same class.

In analyzing the issue, we find that the 1987 Bondholders effectively gave up both their secured and unsecured claims in return for a certain specific treatment under the settlement agreement. Thus, it can fairly be noted that Class 2 addresses only the one, consolidated remaining claim of the 1987 Bondholders. Moreover, this settlement agreement was approved by this court after notice, a hearing, and consideration of AllMed's opposition at that time. The Order approving this settlement has not been appealed. Furthermore, AllMed does not explain how this claim-consolidation adversely affects the treatment of its own claims, thus implicating once again the standing issue noted at page 423 *supra.* Indeed, it is not at all clear that any dividend would have been made available for the unsecured creditors were it not for the settlement agreement.

In raising this Objection, AllMed relies exclusively upon what it perceives to be a technical violation of § 1122(a). As we have noted in the past, "classification itself [is] not

nearly so significant as the consequence of disparate treatment of like or similar claims." *Orfa Corp., supra,* 129 B.R. at 416. Because AllMed fails to articulate any practical repercussions of the alleged classification error, and because we can perceive of none, we will not deny confirmation on this ground. *Cf. In re Community Hospital of the Valleys,* 51 B.R. 231, 234–36 (9th Cir. BAP 1985), *aff'd,* 820 F.2d 1097 (9th Cir.1987) (creditor's "fair and equitable" confirmation objection was nothing more than a belated attempt to attack the trustee's compromise with another creditor which had already been approved by the court, and this court would not allow this objection to prevent confirmation of the plan).

## D. CONCLUSION

The sum total of the success of the Objections is requiring the Debtor to file a further amended plan striking § 10.1 therefrom and clarifying its treatment of priority claims. We will give Debtor a very brief period of time, until May 22, 1995, in which to file a further amended Plan including these seemingly minor amendments and an accompanying motion to effect confirmation of the Plan thus modified. Because the requisite amendments do not adversely affect the treatment of any claim holder, re-solicitation and voting will not be necessary. *See, e.g., In re American Solar King Corp.,* 90 B.R. 808, 823 (Bankr.W.D.Tex.1988).

### ORDER

AND NOW, this 17th day of May, 1995, after a hearing conducted on April 12, 1995, to consider confirmation of the Debtor's Amended Plan of Reorganization ("the Plan") over the objections ("the Objections") of AllMed Financial Corporation ("AllMed") thereto, and upon consideration of the several briefs filed by the parties in interest in support of their respective positions, it is hereby ORDERED AND DECREED as follows:

1. With the exception of the contention that § 10.1 of the Plan must be stricken, and that the Debtor's treatment of priority claims must be clarified, the Objections are DENIED.

2. The Debtor is permitted to file a Motion pursuant to F.R.B.P. 3019 and a black-lined copy of a further Amended Plan consistent with this Opinion, and to serve same on all interested parties listed below, all parties voting on the Plan, all parties requesting notices per F.R.B.P. 2002(i), and the court in chambers, on or before May 22, 1995.

3. A hearing to consider any such Motion filed and confirmation of any further Amended Plan filed shall be conducted on Wednesday, May 31, 1995, at 9:30 A.M.