**In re ENDOSCOPY CENTER OF SOUTHERN NEVADA, LLC, Debtor.**

Nos. BK–S–09–22780–MKN, S–09–22776–MKN, S–09–22784–MKN.

United States Bankruptcy Court, D. Nevada.

May 23, 2011.

530

John T. Hansen, Nossaman LLP, San Francisco, CA, for Debtor.

## MEMORANDUM DECISION ON TRUSTEE'S MOTION FOR APPROVAL OF MEDIATED SETTLEMENT WITH NEVADA MUTUAL INSURANCE COMPANY PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 9019[1]

MIKE K. NAKAGAWA, Bankruptcy Judge.

The Trustee's Motion for Approval of Mediated Settlement Agreement with Nevada Mutual Insurance Company Pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Settlement Motion") was heard on January 21, 2011. Various opposition and reply materials were filed. The appearances of counsel were noted on the record.

---

1. In this memorandum, all references to "Section" are to the provisions of the Bankruptcy Code, 11 U.S.C. section 101 *et seq.* unless otherwise indicated. All references to "N.R.S." are to provisions of the Nevada Revised Statutes. All references to "FRBP" are to the Federal Rules of Bankruptcy Procedure and all references to "FRE" are to the Federal Rules of Evidence.

After oral arguments were presented, the matter was taken under submission.

## PROCEDURAL BACKGROUND[2]

On July 17, 2009, Endoscopy Center of Southern Nevada, LLC ("Endo") filed a voluntary petition for liquidation under Chapter 7. On the same date, Chapter 7 petitions also were filed by Gastroenterology Center of Nevada, LLP ("Gastro"), Case No. 09–22776, and Desert Shadow Endoscopy Center, LLC ("Desert"), Case No. 09–22784.[3] Brian D. Shapiro ("Trustee") was appointed to administer all three bankruptcy cases. An order for joint administration of the cases ("Endoscopy Center Cases") was entered with Endo matter proceeding as the lead case.[4]

Debtors performed endoscopy procedures at outpatient clinics or "centers" located in the Las Vegas area. As a result of an investigation into the practices at the centers, public health alerts were issued by the Southern Nevada Health District and other health agencies asking patients who visited the centers between March 2004 and January 11, 2008, to undergo testing for hepatitis C and other infectious diseases. All of the centers run by the

Debtors ceased operations shortly thereafter.

Debtors are named as defendants in numerous lawsuits ("Hepatitis Litigation") pending in the Eighth Judicial District Court for Clark County, Nevada ("State Court").[5] In addition to the Debtors, the named defendants also include Dipak Desai ("Desai"), who apparently was the operating surgeon for the Debtors,[6] various other medical professionals, and certain manufacturers and/or distributors of products used by the Debtors. The latter entities include Teva Parenteral Medicines, Inc., Sicor, Inc., and McKesson Medical–Surgical, Inc. (collectively "Product Defendants").

As summarized in greater detail below, Nevada Mutual Insurance Company ("NMIC") issued a medical professional liability policy ("Policy") to the Debtors in 2007. With respect to the Hepatitis Litigation, NMIC provided coverage under the Policy, subject to a reservation of rights. Disputes as to the rights and obligations under the Policy arose between NMIC, the Debtors, physicians, nurses and non-physician employees.

---

**2.** In this memorandum, all references to "Dkt# " shall be to the materials filed in Case No. 09–22780 unless otherwise indicated. Where this memorandum refers to materials filed in another case involving a related entity, a similar designation will be used, e.g., Desai Dkt# , and the like.

**3.** Together, the three entities are referred to in this memorandum as the "Debtors."

**4.** On January 13, 2010, Endoscopy Center of Southern Nevada II, LLC ("ESCN II"), also filed a Chapter 7 petition. The case was assigned to the Trustee, but no order has been requested or entered to jointly administer that case with the other Endoscopy Center Cases. The settlement at issue in the current matter also includes the ESCN II estate and a parallel approval motion was filed in that case as Docket No. 74.

**5.** A Schedule of Assets and Liabilities accompanied the Endo bankruptcy petition that was filed on July 17, 2009. Included in the 252 pages of schedules is a 229 page table listing multiple lawsuits pending against the Endoscopy Center as of the petition date. It appears that identical tables were included in the schedules filed in the Gastro and Desert cases as well.

**6.** Desai is shown on each of the bankruptcy petitions as being the general partner of Hari Om Limited Partnership ("Hari Om"), which is identified as the operating manager for each of the Debtors. On March 17, 2010, Hari Om filed a separate Chapter 11 petition, denominated Case No. 10–14347.

On July 23, 2009 and July 31, 2009, several plaintiffs in the Hepatitis Litigation filed motions seeking relief from the automatic stay (Dkt## 20 and 25) so that they could proceed with their claims in State Court. On September 9, 2009, over the objections of the Trustee, the court entered orders permitting the Hepatitis Litigation to proceed, provided that no collection from any insurance or assets available to the Debtors takes place without further order of the bankruptcy court. (Dkt## 89 and 91)

On November 25, 2009, NMIC filed a motion for relief from stay (Dkt# 291) seeking authority to pay certain settlement amounts to various plaintiffs in the Hepatitis Litigation, out of the proceeds of the Policy. The Trustee, who opposed the relief from stay previously granted in the case, also opposed relief from stay to use the proceeds of the insurance Policy to pay the settlement amounts. (Dkt# 326) Desai also opposed the motion. (Dkt# 325) Arguments were presented and the matter was taken under submission.

On January 11, 2010, with the Hepatitis Litigation on going, NMIC commenced an adversary proceeding in this court against the Trustee, denominated Adversary No. 10–1025 ("NMIC Adversary").[7] NMIC's complaint seeks a declaration that the Trustee breached his obligations under the insurance Policy, thereby relieving NMIC of any duty to defend the Trustee or to make payments in connection with the Hepatitis Litigation. The Trustee counterclaimed[8], seeking injunctive relief as well as damages.[9] Desai sought and was granted permission to file an intervention complaint in the adversary proceeding.[10] NMIC subsequently filed a motion to dismiss aspects of the Trustee's Counterclaim ("Dismissal Motion") (Adkt# 12)[11] as well as a motion to dismiss Desai's Intervention Complaint ("Adkt# 42").

In February, 2010, Desai filed a voluntary Chapter 11 proceeding, denominated

7. In this memorandum, all references to "Adkt# " shall be to the materials filed in the NMIC Adversary unless otherwise indicated.

8. The Trustee also commenced a separate adversary proceeding against NMIC, denominated Adversary No. 10–1031, which alleged the same claims and theories set forth in his counterclaim. That adversary proceeding was dismissed without prejudice to the matters being resolved in the NMIC Adversary.

9. The Trustee's counterclaim ("Counterclaim") (Adkt# 9) seeks to enjoin NMIC from disbursing any proceeds from the Policy to third-parties without the Trustee's consent on the theory that the proceeds of the Policy are property of the bankruptcy estate under Section 541. The Counterclaim also seeks damages for breach of the Policy, a declaration that, inter alia, the proceeds of the insurance Policy are property of the Debtors' bankruptcy estate, and damages for insurance bad faith. The Trustee's assertion that the proceeds of the insurance Policy are property of the bankruptcy estate mirrors the position he asserted in opposition to NMIC's motion for relief from stay. On the same date as the hearing on the Settlement Motion, Desai's motion to intervene in the NMIC Adversary was granted.

10. Desai's amended complaint in intervention ("Intervention Complaint") (Adkt# 38) is styled as ten separate causes of action. Those causes of action are pled as five claims for declaratory relief, two claims for injunctive relief, one for specific performance, and two damage claims based on breach of contract and bad faith.

11. The Dismissal Motion is accompanied by numerous exhibits that bear the Bate stamp page numbers affixed by NMIC. The motion also is accompanied by the Declaration of Patricia Jean Schaffran (Adkt# 14) ("Schaffran Declaration"). This memorandum will reference various exhibits attached to the Dismissal Motion and to certain of the Bate stamped pages as necessary. The Trustee filed an opposition to the Dismissal Motion ("Trustee's Dismissal Opposition") (Adkt# 18).

Case No. 10–13050. A committee of unsecured creditors ("Desai UCC") was formed by the Office of the United States Trustee ("UST").

On May 18, 2010, the court entered an order granting the Trustee's request to convert the Endoscopy Cases to Chapter 11 (Dkt# 576) and the same Trustee was appointed (Dkt# 598) in the Chapter 11 cases by the UST. Concurrently with the conversion of the cases, the court entered an order approving the Trustee's agreement with NMIC regarding the pending motions for relief from stay. (Dkt# 577) Under that settlement, the Debtors' rights under the insurance Policy to consent to certain good faith settlements reached with certain plaintiffs in the Hepatitis Litigation were assigned to those plaintiffs. In exchange, the Debtors' bankruptcy estate received $110,000 in cash from the same plaintiffs. The effect of the agreement was to allow NMIC to pay the settlement sums to the plaintiffs, thereby resolving the relief from stay motions.[12] That settlement was approved over the objections of Desai.[13]

On June 21, 2010, NMIC filed a motion seeking relief from stay (Dkt# 629) to permit certain other proceedings in the Hepatitis Litigation to be dismissed with prejudice as to the Debtors as a result of certain settlements that had been reached. Partial oppositions were filed by Desai and the Desai UCC (Dkt## 646 and 672),

and an order granting the motion was entered on August 5, 2010. (Dkt# 710)

On July 29, 2010, NMIC filed a proposed amended Chapter 11 plan (Dkt# 688)[14] that drew objections from numerous parties, including Desai, the Product Defendants, the Trustee and the Desai UCC (Dkt## 721, 723, 729 and 731). On August 27, 2010, the Trustee filed a proposed disclosure statement and attached Chapter 11 plan (Dkt# 755).

On September 21, 2010, the Trustee and NMIC filed a joint disclosure statement and joint Chapter 11 plan (Dkt## 789 and 790) that included a resolution of the NMIC Adversary as well as claims involving parties in the Hepatitis Litigation and in the Debtors' bankruptcy proceedings.[15] Objections to the proposed joint disclosure statement were filed by the Product Defendants, Desai, and the Desai UCC (Dkt## 805, 808 and 810).

On October 15, 2010, the court issued an order denying approval of the joint disclosure statement that accompanied the joint plan proposed by NMIC and the Trustee. (Dkt# 836) On December 3, 2010, a settlement conference was conducted before the Honorable Gregg W. Zive, U.S. Bankruptcy Judge. Counsel for the Trustee, NMIC, Desai and the Desai UCC attended. A settlement was reached between the Trustee and NMIC, but not with Desai or the Desai UCC.[16]

---

12. Both NMIC and Desai filed motions seeking to amend or alter the court's order. NMIC's request was granted by an order entered on June 30, 2010 (Dkt# 639) and Desai's request was denied by an order entered on August 6, 2010 (Dkt# 711).

13. The Trustee had reached an earlier settlement with plaintiffs Henry Chanin and Lorraine Chanin that was approved by the State Court in the Hepatitis Litigation in March 2010. Thereafter, the Trustee sought and obtained bankruptcy court approval of the same

settlement, which was granted by an order entered on April 6, 2010 (Dkt# 500).

14. NMIC initially filed a proposed Chapter 11 plan on June 15, 2010 (Dkt# 660).

15. After reaching a joint plan and disclosure statement with NMIC, the Trustee filed a withdrawal of his proposed disclosure statement and plan of reorganization. (Dkt# 803)

16. On December 9, 2010, the Office of the United States Trustee ("UST") formed a com-

On December 17, 2010, the Trustee filed the instant Settlement Motion. (Dkt# 970) The terms of the settlement are set forth in a Settlement Agreement attached as Exhibit "A" to the Declaration of Brian D. Shapiro ("Shapiro Declaration") (Dkt# 978) accompanying the Settlement Motion.[17] The settlement provides for NMIC to pay $2.6 million to the Debtors' estate, for the NMIC Adversary and the Trustee's Counterclaims to be dismissed with prejudice, for mutual releases to be exchanged between NMIC and the Debtors, and for the Debtors to release NMIC from any further obligations under the Policy including Debtors' former employees (but excluding any non-Debtor insureds). In addition, the settlement provides for relief from stay so that NMIC can settle or complete settlements of claims in the Hepatitis Litigation involving non-Debtor insureds or to proceed to litigate those claims.[18] The settlement does not include the claims raised in Desai's Intervention Complaint. "Joinders" in the Settlement Motion were filed on behalf of various plaintiffs in the Hepatitis Litigation.[19] (Dkt# s 1045 and 1056)

Opposition to the Settlement Motion was filed by Desai ("Desai Opposition") (Dkt# 1032)[20], the Product Defendants ("Product Opposition") (Dkt# 1034), and the UCC ("UCC Opposition")

---

**17.** On January 11, 2011, the Trustee filed another declaration in support of the Settlement Motion. (Dkt# 1057) The only apparent differences between the two declarations is that the earlier one bears an electronic signature while the later one bears a "wet" signature and also is initialed on each page. Additionally, the copy of the Settlement Agreement attached as an exhibit to the later declaration includes the Trustee's signature.

**18.** In conjunction with the Settlement Motion, the Trustee also filed a motion to convert the Debtors' Chapter 11 proceedings back to Chapter 7. ("Conversion Motion") (Dkt# 973) The Conversion Motion was heard on the same date as the Settlement Motion and also was taken under submission.

**19.** Those plaintiffs are Michael Washington, Josephine Washington, Robert Bean, Dolores Cappetto, Dianna Bonner, Shirley Cowan, Deborah Hall–Hilty, David Hilty, Lucia Jansen, Julie Menard, Debry Morris, Janise Munda, Gibb Munda, Merle Richards, Sonia Rivera, Dorothy Rogers, Sharon Roylance, Barbara Sudman, Steven Tiu, Randy Valimont, Victoria Valimont, Roderick Warlick, Patty Aspinwall, Wave Aspinwall, Clifford Brunnell, Harry Fielder, David Magana, Juan Martinez–Charon, Kenneth Nogle, and Jose A. Valdivia. An additional joinder was filed by Wendy O'Brien, plaintiff in a separate proceeding in State Court against a physician who was employed by one of the Debtors. (Dkt# 1022)

**20.** The opposition filed by Desai includes a Declaration of Jeffrey W. Stempel ("Stempel Declaration"), a professor at the local law school who was retained by Desai as a consultant in his bankruptcy case. While there is no dispute as to Professor Stempel's credentials, he is not a percipient witness with personal knowledge of any historical facts as required by FRE 602. Insofar as the Stempel Declaration is offered as expert witness testimony under FRE 702, the contents of the declaration is more in the nature of argument than evidence. Both NMIC and the Trustee objected to consideration of the Stempel Declaration on that basis and their objections are sustained. Had Professor Stempel simply been employed as special counsel, assuming that he is still admitted to practice law, his argument and analysis might have been presented in that fashion.

mittee of unsecured creditors ("UCC") in the Debtors' cases even though a Chapter 11 trustee already had been appointed. (Dkt# 960) Formation of a creditors committee is not uncommon and even beneficial when a debtor in possession administers a Chapter 11 estate, the court sees little if any utility in forming an unsecured creditors committee in a proceeding where the same UST already has selected a trustee to protect the interests of creditors. The same law firms that sought to be employed as committee counsel in the Desai case also have sought to be appointed as committee counsel in the Debtors' cases.

(Dkt# 1043). A "joinder" in the UCC's opposition was filed by the Christensen Law Offices (Dkt# 1112) which apparently represents various patients of the centers, some of whom are infected with Hepatitis C and others who are not.[21] Joinders in the UCC opposition also were filed by the Desai UCC (Dkt# 1049) as well as Glen Lerner and Associates (Dkt# 1044), which apparently represents numerous "non-infected" patients, White & Wetherall, LLP and The Drakulich Firm APLC (Dkt# 1053), which represent various infected and non-infected patients, and Mainor Eglet (Dkt# 1055), which also represents various infected and non-infected patients. An additional opposition (Dkt# 1092) was filed on behalf of various physicians who also are named insureds under the Debtors' insurance policy.[22] The latter opposition, however, was withdrawn at the hearing upon a modification reached with respect to certain provisions of the Settlement Agreement.[23] The Trustee replied separately to the opposi-tions filed the UCC, the Product Defendants, and Desai[24], while NMIC filed a consolidated reply to each of them.[25]

## APPLICABLE LEGAL STANDARDS

The Trustee seeks approval of the Settlement under FRBP 9019. A settlement may be approved if it is fair and equitable when comparing the claims being compromised against the likely rewards of litigation. *See generally Protective Committee for Independent Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 425, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). In approving a compromise, the court is directed to consider (1) the probability of success in litigation of the dispute, (2) the difficulties to be encountered, if any, in the collection of an award, (3) the complexity, expense, inconvenience and delay of litigation, and (4) the interest of creditors in the case, giving deference to any reasonable views expressed. *See In*

---

21. It is unclear whether the patients who are infected with Hepatitis C have established that the disease was contracted at the centers. Apparently, certain claimants in the Hepatitis Litigation have established a "genetic link" to exposure from practices at the centers. *See* Shapiro Declaration at 4:7–17 ("Of the approximately 150 remaining claims by infected patients in the Hepatitis Litigation, there currently is no barometer that I have been provided by the plaintiffs that allows a determination of whether or not the patients were, in fact, infected by the Centers. Moreover, the causation for Hepatitis C infection is complicated, with many potential causes (such as tattoos, foreign travel, etc.) that make infection from the Centers difficult to prove. I do not, however, that NMIC has settled the seven known genetically-linked cases where the patients could link their Hepatitis to the source patients identified by the Southern Nevada Health District. This reality leads me to believe that the very best cases have already been settled.").

22. Those insured physicians are Clifford Carol, Eladio Carrera, Frank Faris, Albert Mason, Carmelo Herrero, Ranadev Mukherjee, Shahid Whid, Vishvinder Sharma, Sanjay Nayyar, Snehal Desai, and Dipesh Banker.

23. NMIC, the Trustee and the various insured physicians agreed to the following language: "Notwithstanding anything to the contrary, including Sections 2.1 and 3.1(b) and (d), the terms and provisions of the settlement agreement are not intended to, and do not, affect the rights of the non-debtor insureds who include, but are not limited to, the insured physicians in the capacity as treating physicians under the policy." The court considers that agreed language to be part and parcel to the settlement proposed in this matter.

24. The Trustee's various replies (Adkt## 1078, 1079 and 1080) will be referred to as Trustee UCC Reply, Trustee Product Reply, and Trustee Desai Reply as necessary.

25. NMIC's consolidated reply (Adkt# 1085) will be referred to as NMIC Reply as necessary.

*re A & C Properties,* 784 F.2d 1377, 1381 (9th Cir.1986). The party seeking approval of a compromise has the burden of persuasion. *Id.*

▮ In deciding whether to approve a proposed settlement, the bankruptcy court must make an informed decision. *See In re Churchfield,* 277 B.R. 769, 773 (Bankr. E.D.Cal.2002). The trustee's business judgment is not alone determinative of the issue of court approval; the "court is not permitted to act as a mere rubber stamp" but must make an independent determination that the compromise is fair and equitable. *See In re Rake,* 363 B.R. 146, 152 (Bankr.D.Idaho 2007). *See also Matter of Foster Mortgage Corp.,* 68 F.3d 914, 918 (5th Cir.1995); *Reynolds v. C.I.R.,* 861 F.2d 469, 473 (6th Cir.1988); *In re Adelphia Communications Corp.,* 327 B.R. 143, 158–59 (Bankr.S.D.N.Y.2005).

▮ The proponent of the settlement must persuade the court that the settlement is in the best interests of the estate. *See Goodwin v. Mickey Thompson Entertainment Group (In re Mickey Thompson Entertainment Group, Inc.),* 292 B.R. 415, 420–21 (9th Cir. BAP 2003). The trustee must demonstrate more than a "mere good faith negotiation of the settlement" because the court must independently make a finding that the compromise is reasonable, fair and equitable. *See In re Casimiro,* 2007 WL 1577947 at *4 (Bankr. E.D.Cal.2007), *citing In re A & C Properties, supra,* 784 F.2d at 1381. *See also Mickey Thompson, supra,* 292 B.R. at 420–21. The trustee must show that he or she made an "informed judgment after diligent investigation." *Kowal v. Malkemus (In re Thompson),* 965 F.2d 1136, 1145 (1st Cir.1992).

> At times, trustees' Rule 9010 motions seem to do little more than recite the trustees' belief that the proposed settlement is fair and offer a general statement that the several *A & C Properties* factors are met. Trustees must do more than parrot the standards or announce that they are satisfied. Their burden is to 'persuad[e] the bankruptcy court that the compromise is fair and equitable and should be approved.' *A & C Properties* at 1381. Thus, they must present a cogent and detailed factual explanation, discussing how the factors apply to the specific litigation and proposed settlement. *Id.* at 1383 (requiring a 'sufficient factual foundation' that a compromise or settlement is fair and equitable). To tolerate less would make the Court into a rubber stamp, allowing the trustee's evaluation to be determinative. The cases, of course, call upon the Court to make the ultimate judgment.

*In re Olson,* 2006 WL 2433448 at *2 n. 8 (Bankr.D.Idaho 2006). *See also In re Marples,* 266 B.R. 202, 206 (Bankr.D.Idaho 2001).

In *A & C Properties,* the circuit panel articulated a four-part test to determine the fairness, reasonableness and adequacy of a proposed settlement agreement. 784 F.2d at 1383. This test is inherently fact-intensive and must be undertaken by the court.

These cases show that the court cannot solely approve the settlement based on the trustee's business judgment; it must make its own analysis. The actual degree of deference to be given to the trustee varies by court. Most cases state the weight is permissive, i.e., the court "should" or "may" give weight to a trustee's judgment. *See generally In re Moorhead Corp.,* 208 B.R. 87, 89 (1st Cir. BAP 1997); *In re Adelphia Communications Corp., supra,* 327 B.R. at 154–55 n. 1.

Some courts rely heavily on the trustee's judgment, leaving the court to only analyze whether the trustee has shown that the

settlement is reasonable. *See In re Churchfield, supra,* 277 B.R. at 773–74 ("The opinion of the trustee is entitled to great weight [but] the bankruptcy court [still] has a duty to make an informed, independent judgment as to the reasonableness of the proposed compromise."); *In re Ashford Hotels, Ltd.,* 226 B.R. 797, 802 (Bankr.S.D.N.Y.1998) (court should not substitute its judgment for the trustee but only test the reasonableness of the trustee's proposal); *In re 110 Beaver Street Partnership,* 244 B.R. 185, 187 (Bankr.D.Mass.2000) (Courts will defer to a trustee's judgment provided the trustee demonstrates the compromise is reasonable and not an abuse of his discretion); *In re Adley,* 333 B.R. 587, 608 (Bankr. D.Mass.2005) (In deciding whether to approve proposed compromise, bankruptcy court "should avoid second-guessing a trustee in the exercise of his business judgment.").

In certain circumstances, some courts give minimal deference to the trustee's business judgment. *See, e.g., Simantob v. Claims Prosecutor, LLC (In re Lahijani),* 325 B.R. 282, 289 (9th Cir. BAP 2005) (the trustee's proposed settlement did "not inspire confidence in his business judgment."); *In re C.R. Stone Concrete Contractors, Inc.,* 346 B.R. 32, 49–50 (Bankr. D.Mass.2006) (trustee's groundless determination was made after interviewing only four witnesses, three of whom were named as defendants in debtor's complaint). Courts often consider the competency and experience of the trustee when determining the degree of deference to allot to the trustee's judgment. *See Ashford Hotels, supra,* 226 B.R. at 803.

## DISCUSSION

Before application of the aforementioned consideration, further description of the claims raised in the NMIC Adversary is required.

## I. *The Litigation Between NMIC and the Trustee.*

As previously mentioned, on July 30, 2007, NMIC issued a claims-made, medical professional liability insurance policy ("Policy") to Debtors and certain physicians and paramedical insureds of the Debtors and Endo II [26] and certain "other covered employees" ("Other Insureds"). Dismissal Motion, Exhibit "A." The Policy requires NMIC to defend the Individual Insureds and Debtors against any suit related to a medical incident arising out of the rendering of professional services to a patient as long as it occurred and was reported to the insured during the policy period. The Policy's defense and settlement provisions provide:

> **We** [NMIC] have the right and duty to defend any suit against an **insured** seeking **damages** which, if awarded, would be covered by the policy, even if any of the allegations of the suit are groundless, false, or fraudulent, and we have the right, but not the duty, to defend any claim against an **insured** seeking such **damages. We** have the right to select defense counsel in any such claim or suit defended by **us.**

> **We** have the right to settle any claim or suit against an **insured** seeking **damages** which, if awarded, would be covered by the **policy;** provided that no such settlement will be made without the written consent of the insured against whom the claim or suit is brought unless:

> A. Such **insured** unreasonably withholds consent to the settlement; or

---

**26.** Certain physicians and paramedical insureds of the Debtors and Endo II are collectively referred to as the "Individual Insureds."

B. The settlement is made after an appeal from any judgment against an **insured.**

Dismissal Motion, Exhibit "A," Section II at NMIC00015 (bold in original). Thus, NMIC also had the right, but not the obligation, to defend any claim against an insured seeking damages that would be covered under the Policy. *Id.* NMIC also expressly retained the right under the Policy to "select defense counsel in any such claim or suit defended by [NMIC]." *Id.* In addition, NMIC retained the right to settle on behalf of each insured any claim or suit against an insured if the damages would be covered by the Policy. *Id.* Significantly, NMIC agreed that it would not settle without the written consent of the insured against whom the claim or suit was brought, unless the insured was unreasonably refusing to settle or the settlement was taking place after an appeal from a judgment that had already been entered again the insured. *Id.*

The Policy's claims payment obligation provides in pertinent part:

[NMIC] agree[s] to pay on behalf of each **insured** all sums which such **insured** shall become legally obligated to pay as **damages** because of any **medical incident** which occurs after the **retroactive date** applicable to such **insured** and which is first **reported** during the policy period; ...

Dismissal Motion, Exhibit "A," Section I at NMIC00015 (bold in original). Thus, NMIC agreed to pay on behalf of each insured all sums that its insured became obligated to pay as damages from medical incidents that occurred during the policy period.

Except for Endo and Desert, the Policy's limits of liability for each insured are $1 million for each medical incident, and $3 million annual aggregate liability "resulting from medical incidents which are first reported during the policy period." Dismissal Motion, Exhibit "A," Coverage Summary at NMIC0007–NMIC0008. Endo and Desert do not have individual liability insurance, but are each specifically covered by a Medical Professional Liability Insured Organization Shared Limited Endorsement (the "Shared Limit Endorsement"). The Shared Limit Endorsement provides, in relevant part:

This endorsement amends the Professional Liability Coverage Part of the **policy.**

In consideration of the fact that the **insured organization** has been included as an **insured** at no premium charge, the **insured organization** shall not have its own limit of liability, but shall share in the limits of liability of the **insured physicians.** Any **damages** covered by the **policy** and paid on behalf of the **insured organization** (whether by reason of a claim or suit against (1) the **insured organization,** (2) any **other covered employee,** or (3) any **insured physician** on account of liability arising by reason of his status as a member, partner, officer, director or shareholder of the **insured organization**) shall be applied against the limits of liability applicable to the **insured physicians,** in such order and manner as **we** deem appropriate. If **damages** covered by the **policy** are awarded, or a settlement is made with **our** consent, against the **insured organization** and one or more **insured physicians,** the total limit of liability available to the **insured organization** and such **insured physicians** shall not exceed the limit of liability then available to under the **policy** to such **insured physicians.** If **damages** covered by the **policy** are awarded, or a settlement is made with **our** consent, against the **insured organization,** but not against any **insured physicians,** the limit of liability available

to the **insured organization** shall equal the average of the limits of liability then available under all policies issued by **us** and providing coverage to such **insured organization.**

Dismissal Motion, Exhibit "A," Insured Organization Shared Limit Endorsement at NMIC00010 (bold in original). Thus, the insured individuals and insured organizations share the various liability policy limits. In this particular context, the Policy's proceeds represent a zero-sum game, meaning damages or settlement payments on behalf of an insured physician reduce the remaining available proceeds for use by the insured organization and vice-versa.

On February 29, 2008, the City of Las Vegas suspended the Debtors' business license. By March 2008, the Debtors had stopped providing medical services. Once the Debtors ceased doing business, they were no longer providing medical services and no longer had any insurable interest. *See* Schaffran Declaration ¶ 7.

On March 6, 2008, NMIC sent the Debtors a Notice of Cancellation stating that the Policy would terminate on April 11, 2008. The Notice of Cancellation stated in part that:

> Coverage under the policy has been cancelled by **us** pursuant to section X of the General Conditions of the Policy for the following reason: **Suspension of medical clinic license and suspension of business license** ... The Cancellation Effective date shall be set at 12:01 a.m. Pacific Standard Time on **April 11, 2008.**

Counterclaim ¶ 25 (bold in Counterclaim).

On April 3, 2008, the Debtors agreed not to challenge the business license suspension and agreed to surrender their license. On April 11, 2008, NMIC cancelled the Policy and refunded the balance of the premium to Gastro, the only debtor who purchased its own policy limits. *See* Schaffran Declaration ¶ 3.

As previously noted, beginning in March 2008, the Debtors, Individual Insureds, and Other Insureds were named as defendants in the Hepatitis Litigation filed in State Court. The various plaintiffs in these actions generally allege that, during the course of endoscopy procedures performed from March 2004 to January 11, 2008, the various defendants exposed the plaintiffs to or transmitted to them communicable diseases by subjecting them to unsanitary and improper procedures, including the alleged reuse of syringes.

Prior to the Policy's cancellation, twenty-three separate lawsuits were filed. *See* Schaffran Declaration ¶ 6. From April 11 to August 1, 2008 (the Policy's original termination date), eleven more cases were filed. After August 1, 2008, two hundred fifty-six cases were filed. *Id.*

Gastro began to pay the annual clinic premium of $418,744 for the Policy in quarterly installments. At the time of Policy cancellation, Gastro had paid three installments, totaling $327,296. With the cancellation, the premium was pro rata revised downward to $303,254, and Gastro received a refund of $24,042 for the unused portion of the original coverage period.

Most of the Insureds under the Policy purchased a Reporting Endorsement (sometimes referred to as "tail coverage"). The reporting endorsement indefinitely extends the date to report claims for medical incidents that occurred during the Policy period. The premium for the tail coverage for most of the physicians was paid by the physicians themselves. *See* Schaffran Declaration ¶ 6. Gastro paid $73,279 for its entity tail coverage, to replace the coverage that had been cancelled by NMIC.[27]

---

**27.** That figure represents a 300% increase over the prior policy premium that had been

Endo and Desert paid nothing for their tail coverage.

Also as previously noted, the various Debtors filed separate voluntary bankruptcy petitions on July 17, 2009. Six months later, the NMIC Adversary was commenced where NMIC seeks a declaration that the Trustee breached his obligations under the Policy, as a result of which NMIC has no duty to defend the Trustee, or the bankruptcy estates, or to make payments under the Policy. Alternatively, the complaint seeks an order directing the Trustee to act in compliance with his duties under the Policy to allow NMIC to defend against the claims in the Hepatitis Litigation.

■ The Counterclaim filed by the Trustee alleges four separate claims for relief against NMIC which may be summarized as follows:

 1. **injunctive relief**—precluding NMIC from disbursing any of the proceeds from the insurance Policy to any third-party (including plaintiffs in the State Court Actions) or on behalf of any of the Debtors' co-insureds (including plaintiffs in the State Court Actions) without first obtaining the Trustee's consent to such a settlement." Counterclaim, ¶ 92.

 2. **breach of contract**—for repudiation and refusing to perform certain alleged obligations that are specifically articulated. Counterclaim, ¶ 97.

 3. **declaratory relief**—on the same alleged contractual obligations that form the basis for the Second Cause of Action. Counterclaim, ¶ 103.

 4. **bad faith**—breach of the covenant of good faith and fair dealing, for rescinding or terminating the Policy, denying claims, requiring debtors to pay "exorbitant premiums," retaining Defense Counsel who have a "conflict of interest," refusing to pay defense costs, and attempting to settle on behalf of others without obtaining the Debtors' consent.[28] Counterclaim, ¶ 107.

In the NMIC Adversary, both NMIC and the Trustee seek declaratory relief concerning the exact meaning, scope, and reach of the Policy, as well as a finding that the other is in breach of the Policy mandates. Of particular concern to both NMIC and the Trustee is whether the proceeds of the Policy are property of the Debtors' bankruptcy estate that can be administered by the Trustee.[29]

## II. Application of the Settlement Approval Factors.

The objections presented by the UCC, Desai and the Product Defendants will be addressed as pertinent below.

---

canceled and refunded by NMIC a matter of days before.

**28.** The Trustee has not separately raised a claim against NMIC under N.R.S.686A.310, which addresses unfair practices in settling claims. A claim under N.R.S. 686A.310 is different from a claim for bad faith. "Bad faith exists where an insurer denies a claim without any reasonable basis and with knowledge that no reasonable basis exists to deny the claim. In contrast, the provisions of N.R.S. 686A.310 address the manner in which an insurer handles an insured's claim

whether or not the claim is denied." *Schumacher v. State Farm Fire & Casualty* Co., 467 F.Supp.2d 1090, 1095 (D.Nev.2006) (citations omitted).

**29.** Count III in the Counterclaim specifically seeks a declaration, amongst other things, that the Policy proceeds are property of the bankruptcy estate. As noted, NMIC previously asserted in connection with its relief from stay motions that the proceeds are not property of the estate that would be subject to the automatic stay.

## A. *Probability of Success.*

The primary components of the Counterclaim are whether the proceeds of the insurance policy are property of the estate and whether the Trustee may pursue a claim for insurance bad faith. These issues are the focus of NMIC's pending Dismissal Motion as to the Trustee's Counterclaim.[30] In considering the probability of success factor, the court must consider the Dismissal Motion.

### 1. *Liability Policy Proceeds as Property of the Estate.*

The Trustee's Counterclaim states that "[t]he Policy is the Debtors' property under Section 541...." Counterclaim at ¶ 94. Yet in his opposition to the Dismissal Motion, the Trustee asserts that "NMIC's Motion, however, conflates the propriety of issuing the injunction—i.e., whether or not the automatic stay or section 105 should be extended to non-debtors such as NMIC-with jurisdiction. That is not the test." Trustee's Dismissal Opposition at 8. The Trustee is the one who is mistaken.[31]

NMIC properly framed the question before the court. If the court has jurisdiction over the Policy *and over* the proceeds flowing from that Policy, then the question of distribution of the proceeds becomes potentially ripe for consideration.[32] However, if NMIC is correct, then the court's ability to control distribution of the Policy proceeds falls to the "unusual circumstances" exception, provided the court determines in the first instance that the interests of the Debtors and non-debtors are inextricably intertwined **and** Debtors' estates would be greatly harmed if the stay were not extended to preclude actions outside the scope of the bankruptcy court, or the heightened injunction standards[33] in the Ninth Circuit.

█ Property of the estate is defined and circumscribed generally by Section 541(a), which provides in pertinent part:

The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

**30.** The breach of contract action set forth in Count II of the Trustee's Counterclaim alleges that the Trustee has suffered economic and compensatory damages, "including, without limitation, the expenditure of substantial sums of attorneys' fees." Counterclaim at ¶ 100. The Dismissal Motion seeks to dismiss Count I (Injunctive Relief) and Count IV (Bad Faith) of the Counterclaim, but not the breach of contract claim. NMIC's separate motion to dismiss Desai's amended Intervention Complaint seeks to dismiss the Sixth (Breach of Contract), Seventh (Injunction–Breach of Contract), Eighth (Specific Performance), Ninth (Bad Faith and Damages) and Tenth (Injunction Against Further Violation of Fiduciary Duty) Claims. (Adkt# 42) As to the Breach of Contract claim, NMIC seeks dismissal on the grounds that attorneys fees incurred by the non-breaching party may not alone serve as the damages supporting a breach of contract claim. For reasons set forth in the court's separate memorandum addressing the dismissal motion on the Intervention Complaint, the court agrees that such attorneys fees are not sufficient to be actionable on a breach of contract theory.

**31.** The court is distressed that the Trustee has completely failed to see or respond to NMIC's jurisdiction argument. Although the court is compelled to view the pleadings in the Trustee's favor, the court will not create legal arguments from whole cloth on the Trustee's behalf.

**32.** The court disagrees that any injunctive relief is required. To the extent that proceeds of the Policy are property of Debtors' estates, they are protected by the automatic stay, subject to any modifications as ordered by the court. No injunction beyond that already in place under Section 362(a) is required since there are sufficient remedies available under Section 362(k) to enforce the automatic stay.

**33.** *See In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir.2007).

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

\* \* \* \* \* \*

(6) Proceeds, product, offspring, rents, or profits of or from property of the estate except such as are earnings from services performed by an individual debtor after commencement of the case.

11 U.S.C. § 541(a)(1) and (a)(6). Congress intended to include a broad range of property within the estate. *See Groshong v. Sapp, Inc. (In re Mila, Inc.)*, 423 B.R. 537, 542 (9th Cir. BAP 2010), *citing United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204–205, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). However, "[t]he estate's legal and equitable interests in property rise no higher that those of the debtor." *First Fidelity Bank v. McAteer*, 985 F.2d 114, 117 (3rd Cir.1993), *quoting, In re Gagnon*, 26 B.R. 926, 928 (Bankr.M.D.Pa.1983).

 Filing a bankruptcy petition does not expand or change a debtor's interest in an asset; it merely changes the party who holds that interest. Further, a trustee takes the property subject to the same restrictions that existed at the commencement of the case. To the extent an interest in property is limited in the hands of the debtor, it is equally limited as property of the estate.[34] *See In re Sanders*, 969 F.2d 591, 593 (7th Cir.1992) (citations and quotations omitted). *Accord, Wein-*

*man v. Graves (In re Graves)*, 609 F.3d 1153, 1156 (10th Cir.2010); *Mourad v. Commissioner Internal Revenue*, 387 F.3d 27, 30 (1st Cir.2004).

 In the Ninth Circuit, as with most other circuits, a debtor's rights in an insurance *policy* are considered property of the estate. *See In re Mila, Inc., supra*, 423 B.R. at 542. *See also* The *Minoco Group of Companies, Ltd. v. First State Underwriters Agency of New England Reins. Corp. (In re The Minoco Group of Companies, Ltd.)*, 799 F.2d 517, 519 (9th Cir. 1986); *ACandS, Inc. v. Travelers Casualty & Surety Co.*, 435 F.3d 252, 260 (3rd Cir.), *cert. denied*, 547 U.S. 1159, 126 S.Ct. 2291, 164 L.Ed.2d 833 (2006); *Houston v. Edgeworth (In re Edgeworth)*, 993 F.2d 51, 55 (5th Cir.1993). However, the principal threshold question in this case revolves around whether the Policy *proceeds* that are potentially going to be paid to injured third-parties are property of the Debtors' estates. The Ninth Circuit has not yet resolved this issue.[35] *See In re Mila, Inc., supra*, 423 B.R. at 540, *citing Metropolitan Mortgage & Securities Company, Inc. v. Cauvel (In re Metropolitan Mortgage and Securities Company, Inc.)*, 325 B.R. 851, 857 (Bankr.E.D.Wash.2005); *Imperial Corporation of America v. Milberg, Weiss, Bershad, Specthrie & Lerach (In re Imperial Corporation of America)*, 144 B.R. 115, 118 (Bankr.S.D.Cal.1992); *In re Daisy Systems Securities Litigation*, 132 B.R. 752, 755 (N.D.Cal.1991).

---

**34.** This limitation concept is well-established in Section 541(d) ("property in which the debtor hold ... only legal title and not equitable interest ... becomes property of the estate ... only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold."). 11 U.S.C. § 541(d).

**35.** *See In re Pintlar*, 124 F.3d 1310, 1314 (9th Cir.1997) ("In light of our conclusion that

*Minoco* does not support the stay [since the policy in question involved only liability and not indemnity coverage], we need not consider whether we may or should adopt the reasoning of In *re Louisiana World Exposition, Inc.*, 832 F.2d 1391 (5th Cir.1987) (distinguishing between a policy itself, which is unquestionably property of the estate, and its proceeds, which require fact-specific analysis).")

The law in this area is not entirely consistent, and seems to depend in large part upon the type of policy involved, and whether the Debtor has or will receive any of the proceeds from the policy. With respect to third-party liability claims-made policies, like the one in question here, case authority suggests that the proceeds are not property of the estate or, at least, that any interest the estate has in these policies is *de minimis*.[36] However, one concept is clear from these decisions: "[c]ases determining whether the proceeds of a liability insurance policy are property of the estate are controlled by the language and scope of the specific policies at issue." *In re Downey Financial Corp.*, 428 B.R. 595, 603 (Bankr.D.Del.2010).

### a. Liability Versus Indemnity Insurance.

The type of coverage provided by the insurance policy and the terms under which the policy proceeds will be paid are determinative of the question regarding whether the proceeds are property of the estate. Although potentially numerous in description, most insurance policies fall into two general categories: liability policies and indemnification policies. Some policies provide for payments only to third parties on behalf of the insured (liability), and some permit payments of proceeds to the insured to reimburse the insured itself for, among other things, costs incurred in defending claims or suits (indemnification). *See, e.g. In re Mila, supra,* 423 B.R. at 540. In addition, some individual policies combine both liability *and* indemnity coverage components; for example, some directors and officers ("D & O") policies provide for not only liability coverage for the carrier to defend the various company directors or officers from suits from third parties (liability coverage) but also include a component that requires the carrier to reimburse the company for the cost of providing the defense to the directors or officers (indemnity coverage). *Id.*

The Policy in the instant case is a "claims made" liability policy. The Policy's Insuring Agreement provides in pertinent part:

> [NMIC] agree[s] to pay on behalf of each **insured** all sums which such **insured** shall become legally obligated to pay as **damages** because of any **medical incident** which occurs after the **retroactive date** applicable to such **insured** and which is first **reported** during the policy period; . . .

Dismissal Motion Exhibit "A," Section I at NMIC00015 (bold in original). Thus, NMIC has, under the Policy, agreed to pay damages on behalf of the Debtors to any third party injured by Debtors because of a medical incident(s) during the policy period. NMIC pays the sums directly to the injured parties on behalf of the Insureds; NMIC does not reimburse or pay any Policy proceeds directly to the Insureds. Under no set of circumstances can the Debtors or other Insureds seek or obtain payment from NMIC under the Policy; nor can they be reimbursed from or by Policy proceeds. Since Debtors apparently have no ability to reach the proceeds directly, or even indirectly, the question of how the proceeds could be part of

---

36. Several courts have had the opportunity to chronicle the evolution of this area of law. *See, e.g. Landry v. Exxon Pipeline Co.,* 260 B.R. 769 (Bankr.D.La.2001); *Liberty Mutual Insurance Co. v. Official Unsecured Creditors Committee of Spaulding Composites Co., (In re Spaulding Composites),* 207 B.R. 899 (9th Cir. BAP 1997); *In re Allied Digital Technologies Corp.,* 306 B.R. 505 (Bankr.D.Del.2004). The court sees no reason to replicate their efforts and, accordingly, limit this analysis to those decisions that most clearly articulate the concepts that form the backbone of the conclusion reached herein.

Debtors' estates becomes the focus.[37]

In *Edgeworth, supra,* the Fifth Circuit was one of the earliest courts to consider the distinction between a debtor's equitable interest in the insurance policy itself as compared with an interest in the proceeds flowing from that policy.[38] 993 F.2d at 55. The case involved a physician, Dr. Edgeworth, whose patient died while under his care. A month later, the physician filed for bankruptcy protection. A question arose whether the family of the deceased could sue Dr. Edgeworth for malpractice in state court, looking only to his medical malpractice insurance proceeds for recovery. 993 F.2d at 55. The debtor's medical malpractice liability insurance policy would only pay injured third parties. On that basis, the court concluded that Dr. Edgeworth had no equitable interest in the policy proceeds. The Fifth Circuit panel noted that the proceeds could not be made available for distribution to creditors other than victims of medical malpractice and their relatives. Additionally, the court found that no secondary impact[39] would affect the debtor's bankruptcy estate. The court concluded that the policy proceeds were not part of the physician's bankruptcy estate and allowed the state court suit to proceed. *Id.*

The *Edgeworth* court offered significant guidance when it determined that proceeds of a typical liability insurance policy are **not** property of the bankruptcy estate.[40] 993 F.2d at 55. The court took pains to distinguish liability policies from policies where the insured/debtor is the beneficiary and has a pecuniary interest in the proceeds of the policy, explaining:

> The overriding question when determining whether insurance proceeds are property of the estate is whether the debtor would have a right to receive and keep those proceeds when the insurer paid on a claim. When a payment by the insurer cannot inure to the debtor's pecuniary benefit, then that payment should neither enhance nor decrease the bankruptcy estate. In other words, when the debtor has no legally cognizable claim to the insurance proceeds, those proceeds are not property of the estate.

> Examples of insurance policies whose proceeds are property of the estate include casualty, collision, life, and fire insurance policies in which the debtor is a beneficiary. Proceeds of such insurance policies, if made payable to the debtor rather than a third party such as a creditor, are property of the estate and may inure to all bankruptcy credi-

**37.** Additional questions are created if the court were to find the proceeds are part of the Debtors' estates. For example, how, exactly, would such proceeds be distributed once they were included in the estates? Would they be marshaled and then distributed to Debtors' creditors according to priority under the Code, or could they be distributed solely to injured third parties, as the Policy would seem to try to compel?

**38.** One of the very first decisions to consider this distinction was the Fifth Circuit panel in *Louisiana World Exposition, supra,* 832 F.2d at 1399 ("The question is not who owns the policies, but who owns the liability proceeds. Although the answer to the first question

quite often supplies the answer to the second, this is not always so. . . .").

**39.** A secondary impact might include a situation where there were more claims than policy proceeds, thus creating a scenario where the remaining assets in the bankruptcy estate might be diminished by those portions of the claims exceeding the policy limits. *See In re Edgeworth,* 993 F.2d at 56.

**40.** The court approached this case as an extension of its earlier analysis in *Louisiana World Exposition* of the distinction between directors and officers liability insurance policies and the proceeds of those policies.

tors. But under the typical liability policy, the debtor will not have a cognizable interest in the proceeds of the policy. Those proceeds will normally be payable only for the benefit of those harmed by the debtor under the terms of the insurance contract.

*Edgeworth*, 993 F.2d at 55–56 (citations and quotations omitted).[41] As in *Edgeworth*, the Debtors and the Insured in the instant case appear to "have [no] cognizable interest in the proceeds of the policy. Those proceeds will ... be payable only for the benefit of those harmed by the [D]ebtor under the terms of the insurance contract." *Id.*

Eight years after the Fifth Circuit's decision in *Edgeworth*, an extremely thorough and well-written decision on this issue was reached in *Landry v. Exxon Pipeline Co., supra.* In *Landry*, property owners had filed environmental tort actions in state court against Exxon. The actions were removed to federal court on the ground that the property owners were asserting claims against the debtor's liability insurers under Louisiana's direct action statute. The *Landry* court ultimately found that the insurance proceeds were not property of the estate and remanded to state court.

In reaching its decision, the court analyzed many issues that are directly analogous to the Debtors' instant case. The *Landry* court observed:

In the liability insurance context the debtor has no cognizable claim to the proceeds paid by an insurer on account of a covered claim. The proceeds are paid to the victim of the insured's wrongful act. The insured debtor cannot ask the insurance company to pay him, or determine on its own how the proceeds of the policy should be distributed, nor can any creditor of the insured seize the proceeds in satisfaction of a claim not falling within the terms of the insurance contract.

As pointed out in *Edgeworth*, the proceeds could not be made available for distribution to the creditors other than those who have claims under the policies. ... When a covered claim arises, the injured debtor may have an interest, albeit a self-serving interest, in having a third party (the insurance company) pay for its wrongdoing, but this is not a legal or equitable interest **in the property** used to pay the claim. The interest the insured debtor has is the contractual right to have its own assets protected from exposure by means of the insurance coverage, according to the terms of the contract.

260 B.R. at 786–787 (bold in original, footnotes omitted), *citing Edgeworth*, 993 F.2d at 56. Thus, the court in *Landry* examined (1) whether the debtor could ask the insurance company to pay him, (2) whether the debtor could determine on its own how the proceeds of the policy should be distributed, and (3) whether any creditor of the insured could seize the proceeds in satisfaction of a claim not falling within the terms of the insurance contract. All of these factors were answered in the negative and each factor weighed against in-

**41.** Shortly after its *Edgeworth* decision, the Fifth Circuit had an opportunity to wrestle with a case nearly identical to the one at bar, in *Homsy v. Floyd (In re Vitek, Inc.)*, 51 F.3d 530 (5th Cir.1995). The court declined the opportunity to resolve the question of how to treat liability insurance proceeds when the policy-owning debtor is but one of two or more named co-insureds whose rights are not merely derivative and the aggregate potential liability substantially exceeds the aggregate limits of the available insurance coverage. 51 F.3d at 535. Instead, the court opted to resolve the case on the basis of applicable Texas insurance law. *Id.*

cluding the policy proceeds as property of the estate. 260 B.R. at 783–800.

Each of the factors noted in *Edgeworth* and *Landry* also is present with respect to the Debtors before this court:

a. Debtors have no claim to the proceeds paid by NMIC for a covered claim, as they are paid directly to the victim of the Debtors' wrongful act(s);

b. Debtors cannot ask NMIC to distribute proceeds to Debtors,

c. Debtors cannot determine on their own how the Policy proceeds will be distributed;

d. Debtors' creditors cannot seize the Policy proceeds from NMIC to satisfy a claim that is outside the scope of the Policy coverage

e. Policy proceeds can only be distributed to the creditors who have claims under the Policy;

f. When a covered claim arises, the Debtors have an interest in having NMIC pay for Debtors' wrongdoing; Debtors' interest is the contractual right to have its own assets protected from exposure by means of the insurance coverage, according to the terms of the Policy;

g. Debtors' estates are not enriched by the existence of coverage or the payment by a liability insurer to a tort victim;

i. The size of the Debtors' estates never changes; the underlying claim base against the estate is affected. Because of the insurance, the estate property is liable for a smaller amount of claims.

Thus, each possible factor on the issue has been answered in the negative in this case. Every factor weighs against including the policy proceeds as property of the estate.

### b. Secondary Impact/Diminution of Estate Assets.

Secondary impact is an additional factor courts have used in some cases to find that insurance policy proceeds are property of a debtor's estate. *See In re Edgeworth, supra*, 993 F.2d at 56. In those cases, the courts find that the proceeds are the property of the estate, in part, because the policy proceeds pay claims that would otherwise need to be paid from estate assets. In effect, the policy proceeds protect the estate's remaining and/or other assets from diminution. *See In re Allied Digital Technologies Corp., supra*, 306 B.R. at 512; *Edgeworth*, 993 F.2d at 56.

Not all courts view the secondary impact rationale as availing. The court in *Landry* made its position on this issue clear:

> The value of the asset side of an insured debtor's estate is not enriched by the existence of coverage or the payment by a liability insurer to a tort victim. The property which the debtor or estate holds, or the interests of the debtor or estate in property, remains the same; it is the underlying claim base for which the estate is liable that is affected. Because of the insurance, the estate property is liable for a smaller amount of claims (calculated by subtracting from the entirety of the claims base the amount of insurance coverage). However, to hold that the debtor has a legal or equitable interest in property used to pay the covered claims because payment of the covered claims by some other party with that party's property may decrease the debtor's overall liability, is utterly backward.
>
> * * * * *
>
> Property, however, does not become property of the estate merely because such property has the effect of reducing the estate's liability, or because of some

other beneficial effect such property has on the estate. **The estate must have a legal or equitable interest in the property which benefits the estate.** 260 B.R. at 787, 789 (bold in original). Even if the court was inclined to consider secondary impacts as one of the factors in determining if the Policy proceeds are part of the Debtors' estates, the court need not consider it here. The secondary impact issue simply does not apply to these instant cases, as the Debtors' individual bankruptcy estates have very few, if any, remaining assets that can be protected.[42] In light of the express terms of the Policy, the factors identified and considered above, and the arguments of the parties, the court concludes that the Debtors have no equitable interest in the proceeds from the Policy and that the proceeds would not be property of the Debtors' bankruptcy estates.

## 2. *The Trustee's Claim for Bad Faith.*

The Trustee's Counterclaim also alleges that NMIC is liable to the estates on a theory of insurance bad faith. In its Dismissal Motion, NMIC maintains that, since the Trustee alleges no damages, other than the expenditure of attorney fees in connection with his declaratory relief and breach of contract claim, the Trustee has suffered no compensable damages and his bad faith claim fails to state a claim upon which relief may be granted. The court having considered the arguments of the parties, concludes that NMIC is incorrect.

### a. The relationship between an insurance carrier and its insured.

 The Nevada Supreme Court has recognized a special relationship between the insured and the insurer, which is similar to a fiduciary relationship. *See Allstate Insurance Co. v. Miller,* 125 Nev. ——, 212 P.3d 318, 325 (Nev.2009), *citing Ainsworth v. Combined Insurance Co.,* 104 Nev. 587, 592, 763 P.2d 673, 676 (1988), *cert. denied,* 493 U.S. 958, 110 S.Ct. 376, 107 L.Ed.2d 361 (1989) (describing the insurer-insured relationship as one of "special confidence"). *Compare Love v. Fire Insurance Exchange,* 221 Cal.App.3d 1136, 271 Cal.Rptr. 246, 251–52 (4th Dist.1990) (refusing to characterize the insurer-insured relationship as fiduciary but acknowledging it is a "fiduciary-type" relationship). Although the Nevada Supreme Court thus far has refused to adopt a standard where an insurance company must place the insured's interests over those of the company, the court has acknowledged that the nature of the relationship requires that the insurer adequately protect the insured's interest. *See Allstate Insurance Co., supra,* 212 P.3d at 326, *citing Powers v. United Services Automobile Association,* 114 Nev. 690, 701–02, 962 P.2d 596, 603 (1998), *modified on other grounds,* 115 Nev. 38, 979 P.2d 1286 (1999). At a minimum, an insurer must consider the insured's interests and its own equally. *See Allstate Insurance Co.,* 212 P.3d at 326. Thus, NMIC must consider the interests of the estate and the Trustee and its own equally in the coverage questions arising in this case.

### i. The duties of the insurance carrier.

 The NMIC Adversary, like the case before the court in *Allstate Insurance Co.,* revolves around an insurer's duty to defend. In *Allstate Insurance,* the court observed:

> Primary liability insurance policies create a cascading hierarchy of duties be-

---

**42.** In view of the court's conclusion that the Policy proceeds would not be property of the Debtors' estates, the only remaining signifi-cant asset in these estates may well be the potential bad faith claim against NMIC.

tween the insurer and the insured. At the top of this hierarchy are two general duties: the duty to defend and the duty to indemnify. The obligation of the insurer in the duty to indemnify is narrower than the insurer's duty to defend.

212 P.3d at 325 (citation omitted). In Nevada, the duty to defend poses a potential conflict of interest for insurance companies:

> The [insurer's] duty to defend contains two potentially conflicting rights: the insurer's right to control settlement discussions and its right to control litigation against the insured. 14 *Couch on Insurance 3d* §§ 200:1, 203:1 (2005). Each of these contractual rights creates additional duties for the insurer. The right to control settlement discussions creates the duty of good faith and fair dealing during negotiations. *See Couch, supra,* § 203:1 (stating that the insurer's right to control settlement negotiations may create a conflict of interest between the insurer and the insured, and therefore, the insurer must act in good faith and give the insured's interests equal consideration with its own). The right to control litigation creates the duty to defend the insured from lawsuits within the insurance policy's coverage. *Couch, supra,* § 200:1.

*Allstate Insurance Co., supra,* 212 P.3d at 324–325.[43] Both the right to control litigation and the duty of good faith and fair dealing are implicated in the present case. The Trustee has alleged that NMIC has breached its covenant of good faith and fair dealing with Debtors and placed its own interests above the interests of the Debtors. Counterclaim at ¶ 107.

---

**43.** *See also AAA Nevada Insurance Co. v. Chau,* 2010 WL 2802164 at *4 (D.Nev.2010) (Navarro, J.) (court applied *Allstate Insurance*

in granting summary judgment in favor of insurer).

## ii. The implied covenant of good faith and fair dealing.

▮▮▮ Nevada law, not the insurance contract, imposes the implied covenant of good faith and fair dealing on insurers. *See Allstate Insurance Co., supra,* 212 P.3d at 324; *U.S. Fidelity v. Peterson,* 91 Nev. 617, 620, 540 P.2d 1070, 1071 (1975). Violating the covenant gives rise to a bad-faith tort claim, with "bad faith" defined as "an actual or implied awareness of the absence of a reasonable basis for denying benefits of the [insurance] policy." *Allstate Insurance Co., supra,* 212 P.3d at 324, *quoting American Excess Insurance Co. v. MGM,* 102 Nev. 601, 605, 729 P.2d 1352, 1354–55 (1986).

▮▮▮ The elements of a claim for insurance bad faith have been described as follows:

> The Nevada Supreme Court adopted the cause of action called "bad faith" in *United States Fidelity & Guar. Co. v. Peterson,* 91 Nev. 617, 540 P.2d 1070 (1975). Nevada's definition of bad faith is: (1) an insurer's denial of (or refusal to pay) an insured's claim; (2) without any reasonable basis; and (3) the insurer's knowledge or awareness of the lack of any reasonable basis to deny coverage, or the insurer's reckless disregard as to the unreasonableness of the denial.

*Schumacher v. State Farm Fire & Casualty Co., supra,* 467 F.Supp.2d at 1096–97 (citations omitted). *See also Siefers v. PacifiCare Life Assurance Co.,* 729 F.Supp.2d 1229, 1236 (D.Nev.2010); *Garcia v. Dawahare,* 608 F.Supp.2d 1228, 1234–1235 (D.Nev.2008). Thus, in order to allege a claim for insurance bad faith in Nevada, an aggrieved insured must allege (1) a denial of (or refusal to pay) an in-

sured's claim; (2) without any reasonable basis; and (3) with the awareness of the lack of any reasonable basis to deny coverage, or reckless disregard as to the unreasonableness of its denial. Absent from this list of items is any requirement that the insured allege its damages. Thus, to the extent that NMIC asserts that the Trustee's Counterclaim is deficient based on a failure to plead his damages for bad faith, no such deficiency exists.

### b. Breach of the Settlement Clause.

In his bad faith claim, the Trustee also alleges that NMIC has refused to consult with or inform the Trustee of the various settlement offers received in the Hepatitis Litigation. Counterclaim ¶¶ 58–66. The Trustee alleges that this failure constitutes a breach of the express terms of the Policy.[44] More important, the Trustee asserts that NMIC's refusal to provide the information constitutes bad faith. Counterclaim ¶ 66.

In *Allstate Insurance Co., supra,* the Nevada Supreme Court also held that failing to adequately inform an insured of a settlement offer may also constitute grounds for a bad faith claim against an insurer:

> Many jurisdictions hold that failure to inform is a factor in a bad-faith claim. Couch, supra, § 203:16. We now join these jurisdictions and conclude that an insurer's failure to adequately inform an insured of a settlement offer is a factor

for the trier of fact to consider when evaluating a bad-faith claim.

212 P.3d at 325. Thus, in Nevada, failing to inform an insured of a settlement offer in a sufficient manner may constitute grounds for a bad faith claim against the insurer.[45]

Interpreting an insurance contract is a question of law. *See Farmers Insurance Exchange v. Neal,* 119 Nev. 62, 64, 64 P.3d 472, 473 (Nev.2003). Because an insurance policy is a contract of adhesion, coverages are to be construed broadly to afford the insured the greatest possible coverage. *United National Insurance Co. v. Frontier Insurance Co.,* 120 Nev. 678, 684, 99 P.3d 1153, 1156–57 (Nev.2004); *Prime Insurance Syndicate, Inc. v. Damaso,* 471 F.Supp.2d 1087, 1095 (D.Nev. 2007). Policies are construed from the perspective of a layman rather than from "one trained in the law," and absent ambiguity, terms are to be given their plain and ordinary meanings. *See McDaniel v. Sierra Health & Life Insurance Co.,* 118 Nev. 596, 598, 53 P.3d 904, 906 (Nev.2002). Ambiguity exists when a policy provision is subject to two or more reasonable interpretations. *See Grand Hotel Gift Shop v. Granite State Insurance Co.,* 108 Nev. 811, 819, 839 P.2d 599, 604 (Nev.1992). If the ambiguity cannot be resolved, the contract is to be construed against the insurer and in favor of the insured. *See Zurich American Insurance v. Coeur Rochester, Inc.,* 720 F.Supp.2d 1223, 1231 (D.Nev.2010); *Estate of Delmue v. Allstate Insurance*

---

**44.** Both NMIC and the Trustee have alleged that the other is in breach of the Policy in a variety of ways. Both also seek the court's interpretation of the contract language, which interpretation will likely resolve most of the alleged breaches of the Policy. NMIC's Dismissal Motion, however, focuses on the injunction and insurance bad faith claims, rather than the breach of contract and declaratory relief claims.

**45.** The court is somewhat mystified that the Trustee failed to cite to the Nevada Supreme Court decision in *Allstate Insurance Co.* when responding to NMIC's Dismissal Motion. (Adkt# 18) That decision is central to any discussion of insurance bad faith under Nevada law and it is the Nevada Supreme Court's most recent published pronouncement on bad faith.

*Co.*, 113 Nev. 414, 417, 936 P.2d 326, 328 (Nev.1997).

The Policy provides in pertinent part as follows:

> **We** [NMIC] have the right to settle any claim or suit against an insured seeking **damages** which, if awarded, would be covered by the **policy;** provided that no such settlement will be made without the written consent of the insured against whom the claim or suit is brought unless:
>
> A. Such **insured** unreasonably withholds consent to the settlement; or
>
> B. The settlement is made after an appeal from any judgment against an insured.

Dismissal Motion, Exhibit "A", Section II at NMIC00015 (bold in original). Under this language, NMIC has the right to settle any claim or suit against an insured seeking damages that would be covered by the Policy. *Id.* However, NMIC also agreed that it would not settle **any** of these claims or suits without the written consent of the insured(s) against whom the claim or suit was brought, unless either the insured unreasonably refuses to settle, or the settlement takes place after an appeal from a judgment that had already been entered again the insured. Absent one of the two express policy exceptions,

NMIC must obtain the written consent of the Trustee before NMIC can settle any of the pending Hepatitis Litigation matters. NMIC does not currently allege that either of the two exceptions under the Policy are applicable.[46]

The Trustee's counterclaim asserts that NMIC has failed to seek or obtain settlement approval from the Trustee, despite continued efforts by the Trustee to obtain such information. Counterclaim ¶¶ 58–66. Failure to seek or obtain such consent prior to a settlement is contrary to the Policy's express terms. The Trustee alleges that he has made repeated requests for the settlement information, all of which have been denied by NMIC. More important, as noted above, failure to adequately inform the Trustee of the various settlements would be a factor in finding bad faith by NMIC. If these allegations are proven to be true, the Trustee's Counterclaim sets forth sufficient facts to plausibly articulate a claim of bad faith based, in part, upon failure to inform or obtain approval by the Trustee of the various State Court settlements.[47] The Dismissal Motion accordingly would be denied that the Trustee could proceed on his theory of bad faith.

■ Based on the foregoing, the court concludes NMIC would prevail as to

---

**46.** NMIC's Adversary complaint asserts numerous acts by the Trustee that NMIC alleges constitute a breach of NMIC's right to control the Trustee's legal defense and settlement of pending actions, including several items directly related to the Trustee's behavior with respect to the settlement of various portions of the Hepatitis Litigation. NMIC's adversary complaint does not, however, allege that the Trustee unreasonably withheld consent to settle any of the Hepatitis Litigation matters. Since none of the Hepatitis Litigation appears to have been resolved by a final judgment against the Debtors, there would be no appeal following such a judgment. Under these circumstances, neither exception to NMIC's con-

tractually-imposed consent obligation appears to have been satisfied based upon the allegations of the complaint. Thus, NMIC apparently would have a continuing obligation under the Policy to seek and obtain the Trustee's written consent to settle any claims or suits against the Debtors in the Hepatitis Litigation.

**47.** The Trustee's Counterclaim also asserts that NMIC's continuing violations of the Policy's cooperation clause warrant a finding of bad faith by NMIC. If true, this behavior by NMIC may also constitute bad faith by NMIC. Counterclaim ¶ 107.

whether the Policy proceeds are property of the bankruptcy estate while the Trustee could pursue a claim under a bad faith theory. Where the outcome of litigation is uncertain for both parties to a settlement, compromise may be appropriate.[48]

### B. Collection Difficulties.

■ The Trustee maintains that NMIC has limited assets available to satisfy any judgment. At one point, the Trustee asserted that the Debtors are entitled to $51 million of coverage under the Policy, *see* UCC Opposition at 18:25–26, and Desai asserts that $54 million of coverage is available. *See* Desai Opposition at 9:17. Exposure of up to $84 million under the Policy also has been suggested by the Trustee earlier in the case. *See* Objections of Brian D. Shapiro, Chapter 11 Trustee, to First Amended Disclosure Statement of Nevada Mutual Insurance Company, at 4:20–23. (Dkt# 729). The Settlement Motion asserts the Trustee's belief that if he were to prevail in demonstrating NMIC's asserted exposure under the Policy, however, NMIC might not have sufficient assets to pay such a judgment.

The UCC asserts that NMIC has a loss reserve of at least $34 million to satisfy its obligations under the Policy, based on the examination testimony of NMIC's president, Andrew O'Brien. *See* UCC Opposition at 23:10–15. Desai asserts that NMIC has a net worth of approximately $18 million. *See* Desai Opposition at 8:6–7.[49] NMIC maintains that all of its loss reserves are not available to satisfy the Hepatitis Litigation claims but does not explain why. *See* NMIC Reply at 14:1–5. NMIC also represents that its surplus for

the year ending December 31, 2009, was $14,873,008. *Id.* at 13 and Exhibit "G" at NMIC 00038.

■ For settlement purposes, it is not essential to determine whether NMIC has the ability to satisfy the maximum asserted exposure under the Policy. The primary inquiry is whether collection difficulties might be encountered, not whether a judgment ultimately might be collected. None of the evidence before the court suggests that NMIC has the assets available to satisfy the most optimistic assertions of coverage by the Trustee, the UCC or Desai. Coupled with the potential for recovery on a bad faith claim, whatever that amount might be, the evidence suggests that NMIC may not have the assets to satisfy both possible exposures. This limited but conflicting evidence militates in favor of the proposed settlement.

### C. Complexity, Expense, Inconvenience and Delay.

■ The Trustee maintains that litigation of the NMIC Adversary is both factually and legally complex and may take years to resolve because of the unsettled legal issues that are raised. *See* Shapiro Declaration at 4:1–4. Absent a settlement, multiple appeals are expected, *id.* at 3:23–24 and 4:3–4, and continued litigation is anticipated to be expensive. *Id.* at 5:25 to 6:5. The Trustee attests that he has approximately $200,000 in cash on hand and does not have sufficient funds to complete the litigation. *Id.* at 6:6–7.

The objecting parties are in disagreement as to whether the litigation is com-

---

**48.** For reasons previously noted in this memorandum, *see* note 30, *supra,* the breach of contract claim set forth in the Counterclaim also may be deficient to the extent the alleged damages are based solely on the attorneys fees incurred by the Trustee in enforcing the language of the Policy.

**49.** Desai's assertion is based on the Stempel Declaration. For reasons previously noted, *see* discussion at note 20, *supra,* that declaration cannot be considered.

plex, *compare* Desai Opposition at 8:11–12 with UCC Opposition at 25:9–14,[50] and none of them credibly dispute that continued litigation would be expensive.[51] None of the objecting parties has suggested, however, that the legal questions concerning the Policy proceeds or the damage components of a bad faith claim are settled. None of the objecting parties has referenced a source of funds to pay further litigation expenses or has proposed counsel willing to undertake litigation of the issues in the NMIC Adversary, including the Counterclaim, on a contingency basis. None has suggested that litigation of the claims set forth in NMIC's Adversary complaint as well as the Trustee's Counterclaims could be completed quickly or that any appeals could be expedited.

The Trustee's assessment of this factor is credible and favors approval of the settlement.[52]

## D. Interests of Creditors and Deference to Any Reasonable Views.

■ By its terms, the Settlement Agreement requires NMIC to pay $2.6 million in cash to the bankruptcy estate and will allow previous settlements to be concluded, resulting an additional $6.3 million to be paid to various plaintiffs in the Hepatitis Litigation.[53] By providing for the termination of the automatic stay, the settlement also permits the other plaintiffs to pursue their claims against the non-Debtor insureds under the Policy. Thus, the Trustee maintains that the settlement will resolve an expensive and contentious dispute with NMIC, permit settlements of the most meritorious claims to be completed, and allow the Hepatitis Litigation to proceed against the non-Debtor insureds without interference by the Debtors' bankruptcy proceeding.

50. Other than listing the four considerations involved in approving a settlement, *see* Product Opposition at 6:1–6, the Product Defendants appear to focus primarily on whether the amount of the settlement is sufficient. *Id.* at 6:11 to 7:7.

51. The UCC asserts that the "record is devoid of any compelling evidence that the litigation with NMIC is complex or cost prohibitive." UCC Opposition at 25:18–19. That is not the case. Prior to the time the Settlement Motion was filed, the legal fees and costs incurred by the Desai UCC had exceeded $1,136,751 in less than six months. (Desai Dkt## 334, 482 and 522) A portion of the fees incurred by the Desai UCC was for seeking to intervene in the NMIC Adversary (Adkt# 48) and to file a motion for summary judgment (Adkt# 52) before the Desai UCC was even granted permission to intervene. The Desai UCC sought over $121,000 in attorneys fees for those efforts and even Desai objected to those fees. (Desai Dkt# 405) The same law firms employed by the Desai UCC have sought to be employed as counsel for the UCC. The most compelling evidence of the cost of further litigation has been provided by the Desai UCC.

52. None of the parties, not even the Trustee, has addressed the "inconvenience" element. While almost all litigation is inconvenient, some litigation may be more inconvenient than others depending on the location and availability of witnesses and parties, seasonal variations, and physical accommodations. This element does not appear to be relevant in this case.

53. Apparently, the existing settlements include the seven infected plaintiffs whose Hepatitis C has been genetically linked to the Centers and who therefore would have the strongest claims against the Debtors. *See* discussion at note 21, *supra*. Those plaintiffs have filed joinders in support of the Settlement Motion, *see* note 19, *supra*, while other infected claimants whose conditions have not been genetically linked have filed joinders in the UCC's opposition to the settlement. Neither Desai, the UCC, or the Product Defendants have suggested that the claims of the Hepatitis Litigation plaintiffs who have not yet reached settlements with NMIC have evidence of a genetic link or other causal connection with the Centers.

All of the objecting parties contend that the settlement amount is inadequate compared to the potential recovery against NMIC. *See* Desai Opposition at 8:18–27; UCC Opposition at 26:17 to 27:2; Products Opposition at 7:8 to 8:3. Moreover, each of them argues that the $2.6 million cash payment will be exhausted by the administrative expenses generated by the Trustee and his professionals in the case.

Whatever doubt there may be as to the sufficiency of the cash portion of the settlement, there is no doubt that a recovery by the Trustee on his Counterclaims is far from certain. Moreover, if NMIC were to prevail on its breach of contract claim, any coverage at all under the Policy—defense or indemnity—might be lost.[54] The cash component of the settlement is not de minimis and the allowed amount of the administrative expenses generated in the case has not been established.

In considering the interests of creditors and their reasonable views, the court takes into account their respective claims and interests. The court has twice noted that settlements already have been reached with respect to the most viable claims against the Debtors, i.e., the claims of infected plaintiffs for whom a genetic link to the Centers has not been disputed. Those creditors of course support the Settlement Motion as it will allow their settlements to be completed. The remaining creditors who are infected with Hepatitis C are less fortunate because they suffer the same physical malady but may not be able to establish a causal connection to the practices of the Centers. While their claims are just as significant medically and their numbers exceed those of the genetically linked plaintiffs, their equities are not as favorable and their legal remedies may reside against entities other than the Debtors and related parties. The claims of non-infected patients are not as significant medically and fortunately[55] their numbers exceed all of the infected claimants.

It is not surprising that the plaintiffs whose claims are less likely to prevail are more willing to eschew a settlement that benefits patients with superior claims, but those views are neither fair nor equitable: it simply visits the litigations risks upon the parties with the most viable claims. Allowing the settlements to be completed with respect to the most viable claims is appropriate. Moreover, to the extent that completion of the settlements also facilitates completion of the Hepatitis Litigation with respect to non-Debtor insureds, the settlement benefits other potential claimants as well.

On balance, the court concludes that the interests of creditors support approval of the Settlement Agreement.

### III. *Additional Considerations.*

Certain additional objections have been raised that do not fall easily within the settlement approval factors. For example, the UCC has suggested that its filing of a proposed plan of reorganization militates against approval of a settlement involving the primary assets of the Debtors' estates. *See* UCC Objection at 17:9–18. It also argues that the settlement was not negotiated in good faith because it mirrors the

---

54. *See* discussion at 4:2–4, *supra.* A separate argument has been raised as to whether coverage may be lost if Desai criminally prosecuted for his conduct in connection with the Centers. Desai was indicted by the State of Nevada in June, 2010. (Desai Dkt# 340, Exhibit "E")

55. By "fortunately", the court means only that the vast majority of potential claimants who were patients at the Centers during the medical incident apparently did not contract Hepatitis C.

joint plan that previously was rejected and was not reached after consultation with the UCC. *Id.* at 27:8 to 30:11. Finally, it maintains that granting relief from stay is not appropriate to facilitate the settlement. *Id.* at 33:10 to 34:18. For his part, Desai argues that approval of the Settlement Agreement should not affect his right to litigate the claims set forth in the Intervention Complaint. *See* Desai Opposition at 13:15 to 14:5.[56] Finally, the Product Defendants argue that the scope of the releases is too broad. *See* Product Opposition at 8:8–24. Each of these concerns is straightforward and easily addressed.

First, the plan proposed by the UCC (Dkt# 1107) is not a reorganization of the Debtors but merely a liquidation of the claims involved in the NMIC Adversary, including the Trustee's Counterclaim. It assures nothing more than an additional layer of administrative expenses. Second, the assertion that the Settlement Agreement was not reached in good faith after a court-supervised mediation is without any evidentiary support. The Trustee attests that neither Desai or the Product Defendants would commit to fund a plan to pay creditors, *see* Shapiro Declaration at 5:15–24, and that only NMIC ever offered to contribute toward a settlement. No contrary declaration or affidavit has been presented by a representative or counsel for the UCC, Desai or the Product Defendants. Third, inasmuch as approval of the Settlement Agreement is in the best interests of the estate, cause to grant relief from stay also would exist under Section

362(d)(1). Numerous motions for relief from stay to conclude the previous settlements already have been filed and approval of the Settlement Agreement effectively grants the relief previously requested.

Fourth, the language of Paragraph 3.1(e) is broad enough to encompass the Intervention Complaint, but nothing in the Settlement Motion indicates any intention to prevent Desai from pursuing those claims. *See* NMIC Reply at 11:13–17. Certainly Desai has not consented to a dismissal of his claims with prejudice. The court's order approving the Settlement Agreement will restrict paragraph 3.1(e) to the NMIC Adversary and Counterclaim so that it will not apply to the Desai Intervention Complaint.[57] Finally, the release language in Section 2.1 of the Settlement Agreement does not appear to exceed the authority of the Debtors or of the Trustee in his administration of the estate. No legal authority is cited by the Product Defendants suggesting that a bankruptcy trustee may not do so. Moreover, the release language does not extend beyond the specified capacity of the partner, member, officer, director, or employee involved.

## CONCLUSION

The Trustee has met his burden of demonstrating that the proposed Settlement Agreement is in the best interests of the estate under FRBP 9019(a). A separate

---

**56.** In particular, Desai is concerned that the dismissal language of Paragraph 3.1(e) of the Settlement Agreement would also result in a dismissal with prejudice of his Intervention Complaint. That paragraph states as follows:

(e) dismissal of the Adversary Proceeding with prejudice, effective upon NMIC's payment of the Settlement payment to the Trustee

**57.** It appears that Desai could pursue his claims against NMIC separately in this court and that dismissal of the Intervention Complaint would unnecessarily delay resolution of the parties' disputes. *Compare Benavidez v. Eu,* 34 F.3d 825, 830–31 (9th Cir.1994). A provision limiting the scope of Section 3.1(e) of the Settlement Agreement will be included in the order approving the Settlement Motion.

order approving the Settlement Motion shall be entered forthwith.